2012 VT 50

## State of Vermont v. James T. Burke

[54 A.3d 500]

No. 10-437

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed June 14, 2012
Motion for Reargument Denied July 11, 2012
Motion for Reconsideration Denied July 30, 2012

*William H. Sorrell,* Attorney General, and *David Tartter,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*James T. Burke,* Pro Se, Newport, Defendant-Appellant.

¶ 1. **Reiber, C.J.** Pro se defendant James Burke appeals his sexual assault conviction under 13 V.S.A. § 3252(a)(1) and resulting eighteen-to-twenty-year sentence. Defendant contends that: (1) he was denied a speedy trial; (2) the trial court abused its discretion by excluding evidence that complainant made false accusations of sexual assault in the past; (3) the court erred by refusing to allow him to present evidence of complainant's past convictions; (4) the court erred by denying his motion to proceed pro se and by ordering him shackled in court; (5) the court improperly imposed a fixed term of imprisonment; and (6) the court should have granted his motion for a new trial.[*] We affirm.

¶ 2. The facts are largely contested. On July 24, 2004, defendant met complainant at the Day Station — a resource for finding employment — in Burlington. Complainant was homeless and had

---

[*] To the extent that defendant raises other issues in his brief, the claims have no merit or are inadequately briefed, or both, and are therefore not addressed in this opinion.

been sleeping in a sleeping bag outside. Defendant invited her to his residence, telling complainant that he had a bedroom available for rent. While en route, the two detoured to pick marijuana and buy wine. After they arrived at defendant's home, complainant and defendant had a few glasses of wine. At this point, the parties' stories diverge.

¶ 3. Complainant testified that she began to feel weird, fuzzy, and a lot more intoxicated than she would have expected from that amount of wine. Complainant recalled that defendant extended his hand across the couch to touch her, and that she moved in the opposite direction. She alleged that the next thing she remembered clearly was waking up in defendant's room alone. Complainant had vague memories of being naked and feeling paralyzed on defendant's floor, and of defendant having sex with her. At some point, she recalled pushing defendant off of her, rolling over, and crying. Complainant also testified to hearing the sound of an electric razor and later discovering that defendant had shaved her pubic area and armpits. Complainant asserted at trial that she never consented to contact with defendant, and that, before they arrived at defendant's home, she had made it clear that she was not interested in a sexual relationship.

¶ 4. Defendant testified that he and complainant were co-venturers — that they voluntarily drank wine, smoked marijuana, and had consensual sex. Defendant contended that complainant's testimony — specifically that she was unconscious for most of her time in the home — is false. He testified that, throughout the day, complainant became "friendlier and friendlier," that she never indicated that she did not want to be touched, and in fact initiated intercourse, and at no time seemed like she was not thinking clearly. Defendant claimed that complainant left his residence on good terms with him the following morning, that he never administered any drugs to complainant without her knowledge, and that complainant created the sexual assault story later.

¶ 5. Defendant further testified to the following. After complainant arrived at his trailer, she drank her glass of wine quickly and then asked for a refill. They smoked marijuana and continued to drink wine. Defendant then began to feel dizzy and left complainant on the couch while he fell asleep in his bedroom. When he awoke, complainant was sitting against the headboard of his bed; she had thrown up on her clothes and the bed. Defendant took the sheets off the bed and left to get complainant a clean shirt.

On his way back to the bathroom, defendant heard his electric razor, and when he entered the bathroom, complainant was shaving her armpits and pubic hair. Afterward, complainant joined defendant on the couch, and they had consensual intercourse. In the morning, defendant left to get breakfast, they ate, and defendant kissed complainant goodbye. After complainant left, defendant cleaned his trailer and noticed that his laptop computer, five twenty-dollar bills, and a kitchen knife were missing. He found two hypodermic needles on the floor of his bathroom and a shirt with blood in it in an area of the arm consistent with where one would inject oneself.

¶ 6. On the morning of July 26, approximately twenty-four hours after she left defendant's trailer, complainant went to Fletcher Allen Hospital and reported that defendant had sexually assaulted her. Two police officers searched defendant's home. After returning to the station, one of the officers received a phone call from defendant inquiring why police had been at his residence and why they had removed various items. The court issued an arrest warrant for defendant on July 28, 2004. Fifteen months elapsed before police arrested defendant on October 19, 2005.

¶ 7. The procedural history of this case is lengthy and convoluted. Between October 20, 2005, when defendant was arraigned, and May 10, 2010, when the trial commenced, defendant filed approximately 190 motions — in writing and orally on the record — including motions to disqualify three trial court judges, a motion to disqualify a prosecutor, and nineteen motions for sanctions. Defendant requested a speedy trial at his arraignment on October 20, 2005, and the court offered to schedule a jury draw in either November or December of that year. Defendant requested that the trial be scheduled in February, and the court made accommodations, indicating that it would schedule a jury draw for the trial in February 2006. Between October and February, defendant, acting pro se, filed approximately thirty motions. Defendant was notified that each time he filed a motion, it stopped the "speedy trial clock."

¶ 8. Defendant made various other requests. On December 12, 2005, defendant, still pro se, requested that the court have the wine and vomit-stained bed sheet tested for drug residue, despite being told that analysis would take approximately six months. Defendant also took the position that he wished to delay taking depositions until the test results came back. On July 2, 2007, over

a year and a half later, and against the court's strong recommendation to the contrary, defendant continued to stress that he was not ready to begin taking depositions because the discovery process was ongoing. A month and half later, defendant again stated that he "specifically requested to hold off on depositions until the discovery is completed."

¶ 9. During the course of pretrial proceedings, defendant expressed discontent with various appointed counsel. Defendant initially waived his right to an attorney at his arraignment, but requested that the judge appoint standby counsel to assist him in serving subpoenas. The judge denied this request, but reiterated that defendant was entitled to have full-time counsel appointed at any time, if he was eligible. Defendant indicated that he preferred to wait for another judge who would grant him standby counsel. In January 2007, defendant requested that the judge appoint an attorney practicing outside of Chittenden County, explaining that he had conflicts with all of the attorneys in the county. Between October 2007 and February 2008, defendant requested, was provided with, and then dismissed, standby counsel. Defendant had stated that he thought an attorney could be helpful in deposing people, but later asserted that his attorney was "interfering with [his] pro se defense" and he was "done."

¶ 10. By mid-April 2008, defendant, acting pro se, began depositions. At a status conference on September 23, 2008, the court set a jury draw date for December 8, but defendant again objected, declaring, "I think it's premature to be talking about a jury draw when we're — we're still in the process of obtaining discovery."

¶ 11. Between November 2008 and January 2009, the parties disagreed about the manner in which complainant's deposition would be taken. Defendant initially agreed to a written deposition, indicating that he had approximately 800 questions, not including follow up, which he intended to submit to the State. After defendant submitted 666 questions, the State objected, and defendant asked the court to authorize him to conduct the depositions on his own. In the meantime, defendant filed a motion for court-appointed full-time counsel, which the court granted on January 7, 2009. The court, in turn, ordered that defendant's newly appointed counsel conduct the depositions. On January 13, 2009, the Office of the Defender General reappointed the standby attorney that defendant had previously dismissed to serve as

defendant's full-time counsel. The court ordered defendant to complete his depositions by the end of August. Defendant's attorney filed complainant's deposition on September 18, 2009.

¶ 12. Throughout pretrial proceedings, the court reprimanded defendant for his language and behavior several times. In April 2008, defendant allegedly threatened the deputy state's attorney after a day of depositions and was arrested for obstruction of justice. At a hearing on October 14, 2009, defendant sought to dismiss his court-appointed counsel, but the court questioned whether he was competent to proceed pro se. During the hearing, the judge observed:

> [defendant] never spoke at a normal volume. He constantly repeated his arguments regardless of the questions or statements of the other participants. He interrupted everyone, including the judge, continuously. He strung together sentences without the slightest pause as he worked himself into a frenzy and remained in an excited state throughout the hearing. He was so overcome with emotion that he was never able to listen and respond appropriately to the statements or questions of others.

Defendant insulted and cursed at his attorney, the state's attorney, and the court more than 100 times during the thirty-five minute hearing. Although the court determined the defendant was competent to stand trial after psychiatric evaluations in 2004 and 2006, the court concluded that, given his previous misconduct, "it is naïve to expect that [defendant] would control himself were he to represent himself during trial." Thus, noting that the right to self-representation is not absolute, the court concluded that through his long course of disruptive behavior defendant had forfeited his right to represent himself.

¶ 13. Trial commenced on May 10, 2010. After a four-day trial, the jury convicted defendant of sexual assault. On May 19, defendant, acting pro se, filed a motion for judgment of acquittal, and the following day, he filed a motion for a new trial. Defendant argued that he was denied a speedy trial, and that the trial court abused its discretion in precluding him from admitting evidence regarding complainant's alleged false accusation of sexual assault against a third party and evidence regarding complainant's past convictions. He also argued that the court wrongfully denied him

his right to proceed pro se, wrongfully ordered him shackled during trial, and unlawfully imposed a fixed term of imprisonment. Finally, defendant contended that both counsel and the court were guilty of misconduct, and that the court erred by denying his motion to recuse the trial judge and refusing to give a jury instruction on a lesser included offense. On November 8, 2010, the trial court denied defendant's motion for judgment of acquittal and his motion for a new trial. This appeal followed.

¶ 14. The first claim defendant raises on appeal is that he was denied a speedy trial — specifically, that the State caused numerous delays, including rescheduling and canceling status conferences. As the trial court is in the best position to determine the weight and sufficiency of the evidence, we use a clearly erroneous standard to review underlying facts found by the court. *State v. Brillon* 2008 VT 35, ¶ 14, 183 Vt. 475, 955 A.2d 1108, *rev'd on other grounds*, 556 U.S. 81, 129 S. Ct. 1283 (2009). We review the ultimate legal question of whether the findings and underlying facts present a violation of defendant's constitutional right to a speedy trial de novo. *Id.* In making a speedy trial determination, we use a balancing test, which weighs the conduct of the prosecution and defendant while examining: "(1) the length of delay; (2) the reason for the delay; (3) the extent to which the defendant asserted the speedy trial right; and (4) any prejudice that accrued to the defendant as a result of the delay." *State v. Vargas*, 2009 VT 31, ¶ 11, 185 Vt. 629, 971 A.2d 665 (mem.).

¶ 15. The first factor — the length of delay — acts as a gatekeeper and must be met in order to trigger review of the other factors. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The length of delay is considered without regard to the reasons for the delay. *Id.* In this case, the delay spanned from October 19, 2005, when defendant was arrested, to May 10, 2010, when the trial began. The State concedes that the length of delay here is significant, and therefore we turn to the other factors.

¶ 16. The second factor is the reason for delay. Delay caused by the defense, even where counsel is assigned, weighs against defendant's argument. *Brillon*, 556 U.S. at 90-91, 129 S. Ct. at 1290. Throughout the proceedings, defendant filed a multitude of motions, including motions to recuse three different judges, a motion to disqualify a prosecutor, and motions for sanctions. To illustrate, the record indicates that on March 3, 2008, the number

of motions exceeded what the computer allowed and therefore all motions filed after March 2 would be "entered as documents and done on handwritten motion reactions." Defendant was told that each time he filed a motion, it stopped the "speedy trial clock." Further delay occurred when defendant requested various experts and evidence analysis, and requested counsel whom he later refused to accept. Defendant's continuous refusal to begin taking depositions further delayed the process. The reasons for the nearly five-year delay in this case were primarily caused by defendant's own actions and are therefore weighed against defendant in a speedy trial determination.

¶ 17. The third factor weighed in a speedy trial determination is the extent to which the defendant asserted the speedy trial right. Defendant raised his right to a speedy trial promptly on October 20, 2005 at his arraignment, and at least four times thereafter. However, defendant's assertion of his right to a speedy trial was often simultaneous with his own actions to postpone trial, and his actions cast doubt on the sincerity of his request. For example, as early as October 20, 2005, at defendant's arraignment, the court offered to schedule a jury draw in either November or December of that year, but defendant requested that it be pushed back to February.

¶ 18. The final factor in a speedy trial determination is whether any prejudice accrued to defendant as a result of the delay. *Vargas*, 2009 VT 31, ¶ 16. Prejudice may be marked by defendant being incarcerated for a lengthy period of time before trial, defendant suffering anxiety, or defendant's case at trial being impaired, with the most consideration given to the latter element. See *Barker*, 407 U.S. at 532. An affirmative demonstration of prejudice is not necessary to prove a denial of the right to a speedy trial, but we "recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett v. United States*, 505 U.S. 647, 655 (1992). In this case, defendant caused significant delay, and cannot now assert that he has prejudiced himself. Given that defendant largely brought delay upon himself through his motion practice and refusal of earlier trial dates, we conclude that defendant was not denied a speedy trial.

¶ 19. The second issue defendant raises on appeal is that the trial court abused its discretion in precluding him from admitting

evidence regarding an alleged false accusation of sexual assault made by complainant. Purportedly, complainant and complainant's friend accused a third party of sexually assaulting complainant's friend. Defendant claims that evidence regarding this alleged false accusation should have been admitted under an exception to Vermont's Rape Shield Law. The Rape Shield Law provides that:

> Evidence of prior sexual conduct of the complaining witness shall not be admitted; provided, however, where it bears on the credibility of the complaining witness or it is material to a fact at issue and its probative value outweighs its private character, the court may admit: . . . [e]vidence of specific instances of the complaining witness' past false allegations of violations of this chapter.

13 V.S.A. § 3255(a)(3)(C).

■ ■ ¶ 20. Defendant contends that Judge Keller initially indicated that he would allow defendant to utilize the Rape Shield exception described above, but that Judge Katz refused to allow the evidence. Despite defendant's contention, the record does not support this argument. Judge Keller deferred the decision until trial, stating that the exception did not apply and that the evidence might come in under a different rule of evidence. Even if Judge Keller had ruled that the evidence was admissible under the Rape Shield exception, this ruling had no binding effect on Judge Katz since pretrial rulings are tentative and subject to change. *State v. Bruno*, 157 Vt. 6, 8, 595 A.2d 272, 273 (1991). The evidence was ultimately excluded at trial, and that ruling was later affirmed in a post-trial entry order that responded to defendant's motion for a new trial. The Rape Shield Law does not apply in this case because the evidence did not relate to the "prior sexual conduct" of the complainant. Nor does the exception apply because the evidence did not relate to a prior false allegation of sexual assault of complainant. Thus, there was no error relating to the Rape Shield Law.

■ ■ ¶ 21. Since the Rape Shield Law does not apply, the evidence could be admitted if relevant and if it met the balancing test of Vermont Rule of Evidence 403 that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. This rule gives the trial court broad discretion in balancing probative value against other factors. *State v. Shippee*,

2003 VT 106, ¶ 13, 176 Vt. 542, 839 A.2d 566 (mem.). In the post-trial entry order, the court explained that Rule 403 bars admission when the probative value is low. Here, the evidence is from an unrelated incident, a mini-trial would have been required to determine whether the third party did assault complainant's friend, and the evidence would have likely distracted the jury and confused the issues. Therefore, because the alleged false statements relate to a purported sexual assault by a third person upon a fourth person, and because the probative value is very low, it was within the trial court's discretion to exclude this evidence.

¶ 22. Defendant also argues that he was deprived of his right to confront complainant concerning her false allegations, and thus, his right of confrontation was violated. This claim is without merit. Not only was complainant thoroughly cross-examined by defendant's attorney, but, "where the testimony sought is of questionable impeachment value and may confuse both the witness and the jury, exclusion of such testimony does not impinge on a defendant's right of confrontation and right to a fair trial." *State v. Hill*, 174 Vt. 566, 567, 816 A.2d 440, 443 (2002) (mem.). As previously noted, the line of questioning that defendant requested had low probative value and would likely confuse the jury. The evidence was therefore properly excluded.

¶ 23. Defendant next argues that he should have been allowed to impeach complainant and complainant's friend — another witness introduced by the State — with evidence of their prior convictions. Specifically, defendant sought to introduce evidence that complainant was convicted of property theft in 2004, and that both complainant and her friend were convicted of aggravated assault in 2005. We review evidentiary rulings deferentially and reverse "only when there has been an abuse of discretion that resulted in prejudice." *State v. Martin*, 2007 VT 96, ¶ 18, 182 Vt. 377, 944 A.2d 867 (quotation omitted).

¶ 24. Vermont Rule of Evidence 609 provides that a party may attack the credibility of a witness with a conviction of a crime if that crime "[i]nvolved untruthfulness or falsification regardless of the punishment, unless the court determines that the probative value of admitting this evidence is substantially outweighed by the danger of unfair prejudice," or if the crime "[w]as a felony conviction under the law of Vermont . . . and the court determines that the probative value of this evidence substantially outweighs its prejudicial effect." V.R.E. 609(a)(1)-(2).

¶ 25. Defendant sought to introduce the complainant's alleged theft conviction under Rule 609, insisting it met the exception for a "conviction of a crime involving moral turpitude." This is no longer the standard. See Reporter's Notes, V.R.E. 609 (explaining that the 1989 amendments to Rule 609(a) replaced the "moral turpitude" standard with a "more precise and relevant" standard — crimes involving "untruthfulness or falsification"). Regardless, the evidence defendant provided in support of his proffer did not indicate that the complainant was convicted, only that she was charged. Thus, even assuming that theft is a crime necessarily involving untruthfulness, the evidence was properly excluded by the trial court.

¶ 26. Regarding the evidence that complainant and her friend were convicted of aggravated assault, defendant sought to introduce these convictions in order to highlight his claim that the complainant falsely claimed that the victim of the aggravated assault had sexually assaulted her friend. In opposition to the State's motion in limine to exclude the convictions, defendant argued that the "convictions will allow the jury to make more sense of [the complainant's] three documented false sexual assault allegations." In other words, defendant's apparent purpose in admitting the evidence was a reiteration of his argument under the Rape Shield statute. Defendant's attorney stated that, "I'm not necessarily looking to introduce the fact that she's got a felony conviction necessarily, but I would like to inquire about the fact that she made the allegation and that it was wrong." Because the convictions were proffered only to support the claim that the complainant made false sexual assault allegations, evidence which was already properly excluded under the Rape Shield Law and Rule 403, any claim on appeal that the convictions should have been admitted to impeach the complainant's credibility has been waived. *State v. Brink*, 2008 VT 33, ¶ 6, 183 Vt. 603, 949 A.2d 1069 (mem.) ("To properly preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." (quotation omitted)).

¶ 27. Defendant also appeals the trial court's decision denying his motion to dismiss his appointed attorney and proceed pro se. In *Faretta v. California*, 422 U.S. 806, 814-17 (1975), the U.S. Supreme Court held that a defendant cannot be forced to

accept a public defender if he voluntarily waives his right to counsel. Later, in *Indiana v. Edwards*, 554 U.S. 164, 177-78 (2008), the Court addressed the issue of mental competency and self-representation and held that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." The Court stated that the right to self-representation is not absolute, and may be limited in cases involving serious obstructionist conduct. *Id.* at 171 (citing *Faretta*, 422 U.S. at 834 n.46). The Court distinguished between the "minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for another legal purpose." *Id.* at 172.

¶ 28. The trial judge made a reasoned decision amply supported by the record. The trial judge had extensive interaction with defendant before rejecting defendant's motion to represent himself. It is clear from the record that defendant was prone to yelling, outbursts, and threatening behavior, and that he was unable to listen to and take direction from the trial judge. Permitting defendant to proceed pro se, when his capacity to do so is questionable, could potentially undercut a fundamental constitutional criminal law objective — providing a fair trial. *Id.* at 176-77. Given defendant's ongoing and extensively documented behavioral issues, we are satisfied that the trial court had sufficient evidence to support its finding that defendant had waived his right to represent himself.

¶ 29. Defendant next argues that the trial court erred in requiring him to be shackled during trial. We review the trial court's ruling on this point for abuse of discretion. *State v. Lee*, 2008 VT 128, ¶ 23, 185 Vt. 110, 967 A.2d 1161. The U.S. Supreme Court looked at this issue in *Deck v. Missouri* and stressed that the use of shackles may interfere with three fundamental constitutional principles: the presumption that the defendant is innocent until proved guilty, a defendant's right to counsel and to secure a meaningful defense, and maintaining a dignified judicial process. 544 U.S. 622, 630-32 (2005). However, the Court also reiterated that "[t]here will be cases . . . where these perils of shackling are unavoidable." *Id.* at 632. Trial courts must have discretion when making decisions regarding the need to restrain dangerous de-

fendants, but given the prejudicial effect of shackles, "due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Id.* As in other cases involving extraneous influences on the jury, we look to whether an irregularity occurred, and whether it had the capacity to affect the verdict. *Lee*, 2008 VT 128, ¶ 23. This Court has rejected the argument that, under *Deck*, a mistrial must be called if a juror briefly sees a defendant in shackles outside the courtroom. *Id.* ¶ 22.

¶ 30. The trial court's decision closely tracks these principles. On numerous occasions, defendant threatened the state's attorney, his own attorney, the court, and others. The court considered the issue carefully, but ultimately made an "individualized security determination[]" that shackles were required to protect the public and to prevent defendant from injuring anyone. *Deck*, 544 U.S. at 632. The court took steps to minimize attention and prejudice caused by the shackles, including a privacy skirt around counsel table and seating defendant in the courtroom before the jury entered. In light of defendant's continual threats of physical violence, the fact that the court took precautions to minimize prejudice, and because of the court's detailed reasoning on the record, we conclude that the trial court did not abuse its discretion by ordering that defendant be shackled during trial.

¶ 31. Defendant also contends that the trial court violated 13 V.S.A. § 7031, which prohibits indeterminate sentencing. We review the trial court's decision regarding whether a sentence conforms to our indeterminate sentence law de novo. *State v. Kenvin*, 2011 VT 123, ¶ 18, 191 Vt. 30, 38 A.3d 26. Vermont's sentencing law previously required that defendant's maximum sentence be no longer than the longest possible sentence for the crime of which defendant was convicted and the minimum sentence be not less than the shortest possible sentence fixed by law for such offense. 13 V.S.A. § 7031(a). The statute was amended in 2011 and now provides that "[a] sentence shall not be considered fixed as long as the maximum and minimum terms are not identical." 13 V.S.A. § 7031(a). We have concluded that this amendment is a clarification of the law, *Kenvin*, 2011 VT 123, ¶ 25, and therefore the amendment applies to defendant's sentence. Because the minimum and maximum terms of defendant's sentence are not identical, he was not sentenced to an impermissible fixed term.

¶ 32. In defendant's motion for a new trial he argued that the evidence was insufficient to convict him. Defendant's basic argument was that complainant was a savvy adult who consented to sex with him. The trial court's decision on defendant's motion for a new trial is reviewed under an abuse of discretion standard. *Hoague v. Cota*, 140 Vt. 588, 591, 442 A.2d 1282, 1283 (1982). The court may grant a new trial if required in the interests of justice. V.R.Cr.P. 33. A Rule 33 motion made on evidentiary grounds is granted "only upon a conclusion by the trial court that, weighing all the evidence including the credibility of witnesses, the verdict is clearly against the weight of the evidence." Reporter's Notes, V.R.Cr.P. 33. In general, credibility of witnesses is a matter "entirely within the province of the jury." *State v. Hinchliffe*, 2009 VT 111, ¶ 22, 186 Vt. 487, 987 A.2d 988. Here, defendant cannot demonstrate that the court abused its discretion in denying him a new trial. He does not present evidence that indicates the jury issued a verdict "clearly against the weight of the evidence." The parties stipulated that they had intercourse — the only issue was whether complainant consented. As defendant states many times, this was a case of "he said-she said." Defendant testified that complainant consented, whereas complainant testified she did not. Ultimately the jury believed complainant, and we cannot overturn that decision on appeal.

*Affirmed.*