NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 25

No. 2014-273

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Orleans Unit, |
| | Criminal Division |
| | |
| Jason Atherton a/k/a Melton | December Term, 2015 |

Howard E. Van Benthuysen, J.

Christopher C. Moll, Orleans Deputy State's Attorney, Newport, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Joshua O'Hara, Appellate Defender, Montpelier, for
 Defendant-Appellant.


PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.      **EATON, J.**  Defendant appeals from a judgment of conviction of sexual assault, in violation of 13 V.S.A. § 3252(a)(1).  He contends: (1) the seating of two biased jurors deprived him of his right to an impartial jury; (2) the trial court committed prejudicial error by prohibiting him from using a prior conviction to impeach a witness; and (3) the prosecutor's comments during closing argument violated his right to a fair trial. We affirm.

¶ 2.      The events that resulted in this conviction and appeal occurred during the late evening and early morning hours of October 26 and 27, 2012.  All of the principal witnesses— the complainant K.M. and her two friends, M.B. and H.D.—testified that, along with defendant, they met at M.B.'s apartment in the City of Newport on the evening in question before driving to

a bar in the Town of Barton. All of the witnesses recalled that several of them, including K.M., consumed alcohol and smoked marijuana before they entered the bar, but denied the use of any other drugs. All of the witnesses further testified that, after leaving the bar, they returned to M.B.'s apartment with defendant. All confirmed that K.M. and M.B. went to sleep in the bedroom, while H.D. and defendant went to sleep on a pull-out couch in the living room.

¶ 3. H.D. testified that, sometime thereafter, she felt the weight shift on the couch as defendant got up, and that she subsequently awoke to the sound of K.M. and M.B. screaming. H.D. then observed M.B. yelling at defendant, "[t]aking swings at him and pushing him out the door," and saw K.M. "curled up in a fetal position hysterical and sobbing."[1]

¶ 4. M.B. testified that she awoke "to the bed moving" and saw defendant on top of K.M. She observed that K.M. appeared to be asleep because she was lying on her back and snoring, and defendant "was in between her legs with his face right in her face." K.M. was naked and exposed. It appeared to M.B. that defendant was engaged in sexual intercourse, although she could not see clearly to confirm this. M.B. testified that she immediately yelled at defendant and pushed him off of K.M., hit him, and physically forced him out of the apartment.

¶ 5. K.M. testified that she awoke to the sound of M.B. screaming at defendant to "get off of her," and saw defendant on top of her. She was naked, and felt defendant's penis inside of her. She recalled that, after M.B. forced defendant off of her, she "curled in a fetal position and cried." K.M.'s mother brought her to a hospital, where she underwent a sexual-assault examination, and was interviewed by an officer with the State Special Investigations Unit. The examination revealed no identifiable sperm, and DNA samples from K.M.'s underwear did not match defendant.

---

[1] As discussed more fully below, the trial court barred defendant from impeaching H.D.'s credibility with evidence of a prior conviction of providing false information to a law enforcement officer.

¶ 6. The investigating officer testified that she interviewed defendant two days after the incident. Defendant confirmed that he was with H.D., M.B., and K.M. on the evening in question and that he returned with them to M.B.'s apartment, but indicated that he then left. Defendant introduced the officer's arrest summary, which noted that defendant also reported the use of drugs that evening, including the snorting of Ritalin.

¶ 7. Defendant moved for judgment of acquittal at the conclusion of the State's case. The court denied the motion. Defendant chose not to testify, and the defense rested without presenting any evidence. Following closing arguments and the court's instructions, the jury returned a verdict of guilty. This appeal followed.

I.

¶ 8. Defendant contends that his constitutional right to an impartial jury was violated by the empaneling of two allegedly biased jurors. The claim is predicated on the written responses of two jurors on questionnaires distributed prior to the jury voir dire. Both checked the "Yes" boxes in responding to a series of questions as to whether they had "ever known anyone who was a victim" of lewd and lascivious conduct or sexual assault, and, if so, whether it "would affect [their] ability to be fair and impartial." As discussed more fully below, defense counsel referred specifically to these questions during voir dire, observing: "There are some sensitive questions that were dealt with in your questionnaires. A number of you have mentioned that you had a friend, family member, or someone close to you who was the victim of sexual assault or lewd and lascivious conduct."[2] Counsel then asked whether "any of you feel that because you have that connection, it would make it hard for you to be impartial on this jury? No." As counsel's last statement indicates, none of the jurors expressed any difficulty with being impartial based on knowing someone who had been the victim of a sexual offense.

_____

[2] There is nothing in the record to suggest that the trial court reviewed the questionnaires prior to the voir dire or was aware of the juror responses referenced by defense counsel.

3

Defendant did not challenge any of the jurors for cause on this basis. Both of the jurors in question here were subsequently empaneled and sat on the jury which heard the case, and both voted to convict.

¶ 9. Parties may raise for-cause challenges to prospective jurors at any time before the jury is empaneled, V.R.Cr.P. 24(b), but "the right to challenge a juror is waived by a failure to object before the jury is impaneled if the basis for the objection is known or might, with reasonable diligence, have been discovered during voir dire." State v. Bruno, 2012 VT 79, ¶ 33, 192 Vt. 515, 60 A.3d 610 (quotation omitted). The record here, as noted, shows that defense counsel was aware of the potential issue of juror bias raised by the questionnaire responses, but did not challenge any juror for cause on that basis. Therefore, we evaluate defendant's claim solely for "plain error . . . [which] is obvious and strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice." Id. (quotation omitted).[3]

¶ 10. Criminal defendants have a constitutional right to trial by an impartial jury, and courts "must safeguard that right by excluding jurors who evince bias against the defendant." State v. Sharrow, 2008 VT 24, ¶ 6, 183 Vt. 306, 949 A.2d 428; see U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury . . . ."); Vt. Const. ch. I, art. 10 ("That in all prosecutions for criminal offenses, a person hath a right to . . . a speedy public trial by an impartial jury . . . ."). We generally divide juror challenges for cause into two categories: "(1) those based on actual bias, and (2) those grounded in implied bias." Sharrow, 2008 VT 24, ¶ 7. A prospective juror has an actual or fixed bias "when, through his or her answers to questions posed on voir dire, the potential juror evinces a state of mind inconsistent with deciding the case fairly." Id. ¶ 8. This may take the

---

[3] Defendant argues that the empaneling of a biased juror constitutes "structural error" that is plain error per se and requires automatic reversal of the judgment. The argument need not be considered here, however, because, as discussed below, we find no error in the seating of the two jurors.

form of statements suggesting that a juror "may have trouble putting aside . . . prejudices, making a decision based only on the evidence, or applying a burden of proof or law." Id. The second category of cases, involving an "implied" or presumed bias, is generally found where a juror has "some relationship to a participant" in the trial from which the court will infer bias as a matter of law. State v. Percy, 156 Vt. 468, 478, 595 A.2d 248, 254 (1990); see also Sharrow, 2008 VT 24, ¶14 (explaining that "implied bias is bias conclusively presumed as a matter of law" and is found where "the prospective juror has such a close relationship with a participant in the trial . . . . that the potential juror is presumed unable to be impartial" (quotation omitted)). No issue of implied bias is raised in this case; the question is one of actual or fixed bias.

¶ 11.    We accord substantial deference to the trial court's ruling on the exclusion of a juror for cause. As we have explained, the trial court occupies "a unique position to evaluate juror bias . . . since an appellate court [cannot] easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses." Sharrow, 2008 VT 24, ¶ 11 (quotation omitted); see also Percy, 156 Vt. at 478, 595 A.2d at 253 (observing that the issue of juror bias "is a question for the sound discretion of the trial judge who has observed the demeanor of the juror on voir dire" (quotation omitted)). Indeed, we have held that "[t]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury." Sharrow, 2008 VT 24, ¶ 11 (quotation omitted).

¶ 12.    With this background in mind, we have little difficulty concluding that the empaneling of the two jurors in question was not error, much less plain error. Written questionnaires of the kind utilized here are designed to assist the voir dire examination by identifying potential juror biases, but they are not the equivalent of, or a substitute for, the voir dire process itself. See, e.g., State v. Perez, 2006 VT 53, ¶ 23, 180 Vt. 388, 912 A.2d 944 (upholding procedure in which court distributed written questionnaire "designed to elicit jurors'

potential racial or ethnic biases," followed by discussion of racism during voir dire); V.R.Cr.P. 24(a)(1) ("The court at any time may direct the clerk to distribute to prospective jurors written questionnaires to assist the voir dire examination."). As noted, a trial court's rulings on juror bias are accorded the highest degree of deference precisely because they rest on a voir dire examination in which the "decisonmaker . . . heard and observed the witnesses." Sharrow, 2008 VT 24, ¶ 11 (quotation omitted). Thus, while written responses to a questionnaire may alert the trial court and the parties to a potential issue of juror bias, voir dire provides the opportunity to explore the issue and confirm or deny its actual existence. See Percy, 156 Vt. at 480, 595 A.2d at 255 (explaining that "[t]he purpose of [a] voir dire examination is to raise alleged bias from the realm of speculation to the realm of fact" (quotation omitted).[4]

¶ 13. That is precisely what occurred here. The record of the jury draw shows that, as is customary, the trial court first addressed the panel of prospective jurors—including the two jurors at issue here—explaining the nature of the charges and the presumption of innocence that remains fixed until the State proves the defendant guilty beyond a reasonable doubt. The trial court then gave way to the state's attorney, who, prior to his specific examination, also explained the process and its goal of ensuring "a fair and impartial" jury "to decide what may be a difficult case to hear," elaborated on the concepts of the presumption of innocence and reasonable doubt, and concluded by asking whether any of the prospective jurors, after hearing about the case, felt

---

[4] This is not to suggest that a juror's response on a questionnaire may never provide the basis for an excusal for cause. As noted, implied or presumed bias is essentially predicated on objective facts, such as a juror's relationship to a trial participant. Sharrow, 2008 VT 24, ¶ 16 ("The doctrine of implied bias is reserved for exceptional situations in which objective circumstances cast concrete doubt on the impartiality of a juror." (quotation omitted)). It is thus possible that bias of this nature may be largely ascertained from a juror questionnaire without the need for extensive voir dire examination. See, e.g., Turner v. Roman Catholic Diocese of Burlington, 2009 VT 101, ¶ 65, 186 Vt. 396, 987 A.2d 960 (holding that trial court erred in refusing to dismiss juror who demonstrated implied bias through questionnaire responses showing active membership and participation in diocese and strong awareness of recent church writings emphasizing risk to church finances from litigation).

that they could not "be a fair and impartial juror for any reason." None of the jurors indicated that they could not be impartial.

¶ 14. Defense counsel followed the state's attorney in addressing the panel. As noted, counsel expressly referred at the outset to "some sensitive questions that were dealt with in your questionnaires" and observed in this regard that "[a] number of you mentioned that you had a friend, family member, or someone close to you who was the victim of sexual assault or lewd and lascivious conduct." Defense counsel then specifically asked the panel if "any of you feel that because you have that connection, it would make it hard for you to be impartial on this jury?" None of the jurors indicated that they would be unable to render an impartial verdict based on their acquaintance with the victim of a sexual assault. Defense counsel did not discuss the questionnaire responses specifically with the two prospective jurors who had expressed reservations in the questionnaires.

¶ 15. The voir dire record thus affords reasonable assurance that defense counsel was alerted to the potential issue of juror bias raised in the questionnaire responses, and confirmed through specific inquiry that it would not affect any of the jurors' ability to render an impartial verdict.[5] As the record here shows, the voir dire process itself serves to impress upon potential jurors certain fundamentals of our justice system, including most importantly the presumption of innocence and the State's burden to prove guilt beyond a reasonable doubt. It is hardly surprising, therefore, that a juror's initial written response on a questionnaire may change in the voir dire proceeding, just as an initial response in the proceeding itself may change after further questioning and instruction. See, e.g., Bruno, 2012 VT 79, ¶ 31 (upholding trial court's refusal to excuse juror for cause despite "her initial, but subsequently repudiated uncertainty about

_____

[5] Indeed, given the absence of any challenge by defense counsel, we cannot be sure that he did not simply make a tactical decision to leave the two jurors on the panel. Finding reversible error on this record would thus provide the opportunity for counsel to make a tactical decision to leave prospective jurors on the panel who had responded affirmatively to these types of questions and, if the trial did not result in an acquittal, to obtain a reversal on appeal.

whether she could set aside her views about drugs"). Although, to be sure, "a juror's stated confidence in his own impartiality is not dispositive of the question of fixed bias," State v. Sharrow, 2008 VT 24, ¶ 9, "[w]here a prospective juror has stated that he or she can judge the case fairly, or has at least failed to say that he or she could not, we have been reluctant to conclude that the potential juror had a fixed bias as a matter of law." Bruno, 2012 VT 79, ¶ 29 (quotation omitted). Based on the record here, we are not persuaded that either of the jurors was biased, or that their participation deprived defendant of his fundamental right to a fair and impartial jury.

II.

¶ 16. Defendant next contends that the trial court erred in barring him from using a prior conviction to impeach the testimony of H.D. The issue arose during defense counsel's cross-examination of H.D., when he sought permission to impeach the witness with her prior 2008 conviction for providing false information to a police officer. The State objected to its use on the basis of relevance, and argued that its prejudicial effect outweighed any probative value. After a brief discussion among the court and counsel, the court ruled as follows: "The proffer of conviction is for misdemeanor false information to a police officer. It looks like it was ultimately a short work crew sentence with a fine attached. It was handed down in May of '08, so that's coming up on about six years ago now. I think that the probative value with this kind of misdemeanor is outweighed by the prejudicial effect, so I won't allow you to use it." In response to the ruling, defense counsel argued that the case turned on "credibility" and that the prior conviction for making a false police report was highly probative, but the trial court—noting that its conclusion might be different "if this was the victim as opposed to a witness"—reaffirmed its ruling.

¶ 17. We review the trial court's "evidentiary rulings deferentially and reverse only when there has been an abuse of discretion that resulted in prejudice." State v. Burke, 2012 VT

50, ¶ 23, 192 Vt. 99, 54 A.3d 500 (quotation omitted). Under Vermont Rule of Evidence 609(a), a party may attack the credibility of a witness with evidence that the witness has been convicted of a crime if the crime either "(1) [i]nvolved untruthfulness or falsification regardless of the punishment, unless the court determines that the probative value of admitting this evidence is substantially outweighed by the danger of unfair prejudice," or "(2) [w]as a felony conviction . . . and the court determines that the probative value of this evidence substantially outweighs its prejudicial effect." V.R.E. 609(a). Such evidence is not admissible in either case "if a period of more than 15 years has elapsed since the date of the conviction." V.R.E. 609(b).

¶ 18. Rule 609 is also explicit in requiring an analysis by the trial court—on the record—of the factors that it considered in determining the admission of a prior conviction for impeachment purposes. See V.R.E. 609(a) ("The court shall articulate on the record the factors considered in making its determination."); see also State v. Goodrich, 151 Vt. 367, 374-75, 564 A.2d 1346, 1350-51 (1989) (holding that failure to adequately address factors governing admissibility of prior convictions used to impeach defendant may be grounds for reversal).

¶ 19. We have identified a number of factors to be considered by a trial court when the witness to be impeached is the defendant and the risk of prejudicial error is highest, see State v. Gardner, 139 Vt. 456, 460-61, 433 A.2d 249, 251-52 (1981), but have applied them in other contexts, as well. See, e.g., State v. Covell, 146 Vt. 338, 340-41, 503 A.2d 542, 544 (1985) (discussing Gardner factors in determining whether prior conviction was properly used to impeach complaining witness). These include both the nature of the crime charged and of the prior conviction, particularly if they are similar; the number of prior convictions; the date of the prior conviction; the relative importance of the witness's testimony; and the concomitant need for his or her impeachment. Gardner, 139 Vt. at 460-461, 433 A.2d at 251-52.

¶ 20. We have also emphasized that Rule 609's distinctly different balancing tests depending on the nature of the prior conviction "reflect a determination that convictions

9

involving untruthfulness or falsification, whether or not felonies, are of the highest relevance in determining credibility," and that it is therefore "easier to admit convictions based on untruthfulness or falsification and harder to admit other convictions." State v. Ashley, 160 Vt. 125, 128, 623 A.2d 984, 986 (1993).

¶ 21. Turning to the record here, we are confronted with a number of anomalies in the trial court's analysis. There was no dispute that H.D.'s prior conviction for providing false information to a law enforcement officer involved an element of untruthfulness or falsification. Yet the trial court made no finding or reference to this element of the prior conviction, an omission with critical implications given the clear preference under Rule 609 for the admission of such prior convictions. See Ashley, 160 Vt. at 128, 623 A.2d at 986 (noting that Rule 609's differentiation based on the nature of the prior conviction "reflects a determination that convictions involving untruthfulness or falsification . . . are of the highest relevance in determining credibility" (quotation omitted)); see also Reporter's Notes, 1989 Amendment to V.R.E. 609 (observing that Rule's distinction between convictions involving untruthfulness or falsification and other offenses is "intended to shift the balance in favor of the admissibility of convictions involving untruthfulness and falsification").

¶ 22. Additionally, in observing to counsel that "[y]ou would agree misdemeanors are less," the trial court appeared to conclude that the prior conviction in this case carried less probative value for impeachment purposes because it was a misdemeanor instead of a felony. The trial court underscored the point in observing that H.D.'s punishment was "a short work crew sentence with a fine attached," and ultimately in concluding that "the probative value with this kind of misdemeanor is outweighed by the prejudicial effect." (Emphasis added). Rule 609, however, indicates that the punishment imposed for crimes involving untruthfulness or falsification is largely immaterial in determining their admission for impeachment purposes. See V.R.E. 609(a)(1) (providing that prior conviction may be admitted to impeach a witness if it

"[i]nvolved untruthfulness or falsification <u>regardless of the punishment</u>" (emphasis added)); see also <u>Ashley</u>, 160 Vt. at 128, 623 A.2d at 986 (observing that differential analyses under Rule 609 depending on nature of prior conviction "reflects a determination that convictions involving untruthfulness or falsification, <u>whether or not felonies</u>, are of the highest relevance in determining credibility" (emphasis added)).

¶ 23.   In addition to the trial court's failure to discuss the clear—if not presumed—probative value of a prior conviction containing an element of untruthfulness or falsification, the court also failed to articulate the factors underlying its conclusion that the probative value was "outweighed by the prejudicial effect."[6]   The only factor specifically mentioned by the court in this regard was the age of the conviction, which occurred nearly six years earlier, but this was well within the fifteen-year statutory limit, and not particularly old for impeachment purposes. See, e.g., <u>State v. Martin</u>, 2007 VT 96, ¶ 50, 182 Vt. 377, 944 A.2d 867 (upholding court's discretion to allow use of seven-year-old conviction for knowingly transporting stolen property, observing that "[d]ishonesty is relevant to credibility . . . and defendant offers no reason to assume that a person adjudicated as dishonest is necessarily more reliable as a witness seven years hence"). Although the trial court later observed that its conclusion might be different if the witness to be impeached by the prior conviction were the complainant, this did not affect its relevance to H.D.'s credibility, and does little to explain or support the court's ultimate conclusion that its probative value was outweighed by the danger of unfair prejudice.

¶ 24.   Nor were the usual risks of prejudice from the use of a <u>defendant's</u> prior conviction present in this case.   Since H.D. was not the accused, there was no danger of unfair prejudice resulting from a similarity between the prior conviction and the current charge, nor any risk of dissuading the accused from testifying in his own behalf.   Whatever concerns informed

---

[6]   It is worth nothing, as well, that the court failed to find, as required by Rule 609(a)(1), that the probative value was "substantially" outweighed by the danger of unfair prejudice.

the court's conclusion that the danger of unfair prejudice from the prior conviction outweighed its probative value, therefore, were neither clearly stated nor readily apparent on the record. We are left with a markedly inadequate record of the factors the trial court considered in making its decision to exclude the evidence, contrary to the explicit requirement of Rule 609.

¶ 25. Nevertheless, we are not persuaded that the court's ruling ultimately had any effect on the verdict. See State v. Malshuk, 2004 VT 54, ¶ 14, 177 Vt. 475, 857 A.2d 282 (mem.) ("[I]f it is clear beyond a reasonable doubt that defendant would have been found guilty even if the proffered evidence had been admitted, the court's ruling will be deemed harmless error."). Unlike the other two women in the apartment that night—M.B. and the victim K.M.— H.D. did not witness the offense. Her recollection that she became aware of defendant getting up from the couch where they were both asleep added little to the testimony of M.B. and the victim, who both placed defendant in the bedroom. H.D.'s additional testimony that she later heard M.B and the victim screaming and shouting profanities at defendant, saw M.B. push defendant out the door, and observed the victim to be hysterical was also identical to the testimony of both of the other women. Thus, even if H.D.'s prior conviction had been admitted for impeachment purposes, its impact would have been minimal given the limited and cumulative nature of her actual testimony. See State v. Fuller, 168 Vt. 396, 408-09, 721 A.2d 475, 484 (1998) (holding that erroneous exclusion of impeachment evidence was harmless in view of limited probative value of witness's testimony and defendant's opportunity to impeach witness with other evidence).

¶ 26. Furthermore, H.D. acknowledged on cross-examination that all of the parties that evening had consumed a considerable amount of alcohol, that they had also smoked marijuana, and that the victim was intoxicated when she left the bar. To the extent that the defense was

based largely on the victim's impaired perception from being asleep and using drugs and alcohol, it was these admissions by H.D. that were critical.[7]

¶ 27.   On this record, therefore, we are satisfied that the admission of H.D.'s prior conviction for impeachment purposes would not have appreciably aided the defense, and that its exclusion was harmless beyond a reasonable doubt.

III.

¶ 28.   Lastly, defendant contends that the prosecutor committed prejudicial error in two respects during closing argument.  First, he cites the prosecutor's opening remarks, in which he stated:

> I would like to begin by asking you all a question.  It really goes to the heart of this matter, and that is, is a woman any less entitled to protection under the law because she doesn't live in an ivory tower?   Is she subject to abuse, to crimes of violence because she drinks or goes to parties?  Is she any less deserving of a fair trial because she doesn't live in an apartment with doors or because her only form of entertainment is drinking with her friends or because she relied on the defendant for a ride?
> [K.M.] and [M.B.] are all real people.  They struggled to make the best of their situation.  And like most of us, they made mistakes along the way.  But you know what, they do the best they can with what they have and they deserve their fair consideration.  They deserve justice.

¶ 29.   Defendant did not object to this argument.  Accordingly, we review the claim solely for plain error, which requires a showing of error that "strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice."  State v. Hemond, 2005 VT 12, ¶ 14, 178 Vt. 470, 868 A.2d 734 (mem.) (quotation omitted).   We agree that the remarks were improper.  As we have repeatedly cautioned, counsel should "confine argument to the evidence of the case and the inferences properly drawn from it" and avoid "inflammatory statements or appeals to the sympathy of the jury."  State v. Madigan, 2015 VT 59, ¶¶ 30-31, ___ Vt. ___, 122

---

[7] In closing argument, defense counsel emphasized the witnesses' admissions about the use of alcohol, urging the jury to "use your commonsense about having eight, ten, and twelve drinks and how that affects your memory and your credibility."

13

A.3d 517 (quotation omitted); accord State v. Reynolds, 2014 VT 16, ¶ 30, 196 Vt. 113, 95 A.3d 973 ("Counsel must avoid appealing to the prejudice of the jury, and should not play on the jury's sympathy or seek to inflame their passions." (quotation omitted)); State v. Rehkop, 2006 VT 72, ¶ 35, 180 Vt. 228, 908 A.2d 488 ("While prosecutors are entitled to a good deal of latitude in their closing arguments, they are bound to keep within the limits of fair and temperate discussion circumscribed by the evidence in the case." (quotation omitted)). The prosecutor's assertion here that women like M.B. and K.M. who drink alcohol or go to parties are no less deserving of a fair trial and the law's protection represented a patently improper effort to "play upon the jurors' natural sympathy for the victim," Madigan, 2015 VT 59, ¶ 31, and his assertion that "they deserve justice" was equally inappropriate. See Reynolds, 2014 VT 16, ¶ 31 (observing that "[a] call for justice may be acceptable when it is directed to the jurors' duty to do justice in a general sense" but "an appeal to the jurors to do justice on behalf of the victim or the local community is generally viewed as unprofessional and improper").

¶ 30. We are not persuaded, however, that these introductory remarks resulted in a fundamental miscarriage of justice. Although, to be sure, the prosecutor asserted that it went "to the heart of the matter," his appeal to the jurors' sympathy was, in fact, brief; the balance of the closing argument was generally focused on a review of the evidence, its strengths and weaknesses, and the reasonable inferences to be drawn therefrom; and the prosecutor did not return or even allude to the subject of his opening remarks at any point during the remainder of the argument or the subsequent rebuttal. Contrary to defendant's claim, this was not a case like Rehkop, where we held that the prosecutor "plainly prejudiced the defendant's right to a fair trial" by "stating blatantly his opinion that the defense witnesses" whose credibility were the critical issue at trial had "lied under oath." 2006 VT 72, ¶ 38. Here, the error was confined to the misguided melodrama in the prosecutor's initial remarks, was brief in nature, and did not directly undermine any theory or argument of the defense. See Hemond, 2005 VT 12, ¶ 12

14

(noting that, in assessing whether prosecutor's statements in closing argument require reversal, we consider several factors, including their "persistence and frequency," overall context, and whether they impacted "theory of the defense"). Accordingly, we are not persuaded that the error deprived defendant of his fundamental right to a fair trial.

¶ 31. Defendant also claims that the prosecutor committed fundamental error during closing argument by improperly commenting on defendant's constitutional right not to testify. Near the end of his closing argument, the prosecutor stated: "What can you really know if you weren't there. [K.M.] and [M.B.] were actually there. They were actually part of the crime you are asked to judge. I submit to you that neither had a motive to lie. Can the same be said of the defendant?" Defense counsel objected, arguing that the remark was an improper comment on defendant's Fifth Amendment right not to testify by essentially implying that, in contrast to K.M. and M.B., defendant refused to take the stand because he would have been motivated to lie. The prosecutor countered that he was merely referring to admissions by defendant introduced through other witnesses. The court sustained the objection, denied defendant's motion for a mistrial, and gave a curative instruction to the jury as follows:

> Members of the jury, I remind you, at this juncture, that [defendant], as the person charged here, is under no obligation to present any evidence in this case at any point in time. He's under no obligation to make a statement or to present witnesses. You should draw no conclusions whatsoever from his choice not to testify in this case and not to present any evidence.

In its subsequent charge to the jury, the court reaffirmed the point as follows: "Now, [defendant] has chosen not to testify or to present evidence in this matter. That is his absolute right under our Constitution and the law and you should draw no conclusions from his decision to exercise that right in this trial."

¶ 32. Defendant renews his claim that the prosecutor's remark violated his Fifth Amendment rights, that the court's instruction was inadequate to cure the error, and that the

court abused its discretion in denying his request for a mistrial. The claim is unpersuasive. While comment by the State on a defendant's failure to testify is both constitutionally and statutorily prohibited, see Griffin v. California, 380 U.S. 609, 615 (1965); 13 V.S.A. § 6601, such remarks must be "of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." State v. Zele, 168 Vt. 154, 160, 716 A.2d 833, 838 (1998) (quotation omitted).

¶ 33.    It is unclear from the record whether, in sustaining defendant's objection, the trial court agreed with defendant that the prosecutor had commented on defendant's right not to testify or whether it construed the statement as simply a comment on certain contradictions between defendant's statements to the police and the testimony of the witnesses at trial.[8]   In denying defendant's post-judgment motion for a new trial, however, the court clarified that it believed the prosecutor's "argument referred to the contradiction between [defendant's] statements to the police concerning the pill use, versus the State's witnesses admitting only to the marihuana use." The court explained that it gave the curative instruction "out of an abundance of caution" and was satisfied that this "one isolated comment, apparently relevant only to [defendant's] limited statements to the police, was cured."

¶ 34.    We agree that the prosecutor's statement here was not "of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." Zele, 168 Vt. at 160, 716 A.2d at 833. Although defendant claims otherwise, the argument defeats itself. Defendant maintains that, in observing that K.M. and M.B. were "there" at the scene of the crime, stating that neither had "motive to lie," and asking rhetorically whether the "same [can] be said of the defendant," the prosecutor commented on defendant's decision not to testify  because "to defend himself he would have had to lie." Even if such an inference were

_____

[8]   Following the objection, the court initially noted that the record contained a number of "statements of the defendant admitted into evidence," but the court also subsequently referred to "the comment on his right."

16

possible, however, it can hardly be said to flow "naturally and necessarily" from the remarks. Nothing in the prosecutor's comment here contains any direct or indirect comment on defendant's silence of the kind that courts have found to be improper. See, e.g., Griffin, 380 U.S. at 610-611 (condemning as impermissible prosecutor's statement that victim "is dead, she can't tell you her side of the story. The defendant won't."); United States v. McDermott, 918 F.2d 319, 327 (2d Cir. 1990) (holding that prosecutor impermissibly commented on defendant's failure to testify by noting that critical evidence was "is in the control of the defendant alone"); State v. Rocheleau, 131 Vt. 563, 576-77, 313 A.2d 33, 42 (1973) (condemning as improper prosecutor's several observations that testimony of State's witnesses was "unrebutted"). Accordingly, we are not persuaded that the prosecutor here impermissibly commented on defendant's right not to testify. In light of our conclusion, we need not address defendant's corollary claims that the court's curative instruction was inadequate, or that a mistrial was required.

¶ 35. Relying on the same remarks, defendant further contends that the prosecutor committed misconduct by calling him a liar. He relies on a line of cases holding that it is unfair for the prosecutor to express a personal belief that the defendant is a liar, owing to the general "risk that the jury will give special weight to this opinion because of the prestige of the prosecutor and the fact-finding facilities available to the office." State v. Francis, 151 Vt. 296, 299, 561 A.2d 392, 394 (1989) (quotation omitted); see, e.g., State v. Lawton, 164 Vt. 179, 184, 667 A.2d 50, 55 (1995) (holding that prosecutor improperly "interject[ed] her personal opinion of defendant's character and credibility" through comments such as defendant "had a lot of practice lying"); State v. Ayers, 148 Vt. 421, 424-25, 535 A.2d 330, 333(1987) (finding error in prosecutor's statements that "I think . . . [complainant's] story . . . is the truth," and "I believe that [defendant] on that day severely breached that responsibility [as a driver] by undertaking the actions [on the road]").

¶ 36. There is nothing in the prosecutor's comment here to suggest that he was expressing any personal view that defendant was a liar. While contrasting the "motive to lie" of K.M. and M.B. with that of defendant might have been rhetorical overkill, since defendant obviously had a great deal more at stake, it was essentially a comment on the evidence rather than a statement of personal belief. In State v. Kinney, for example, we addressed a similar claim based on a much more explicit statement by the prosecutor during closing argument that the defendant had "lied" to the police about several matters in statements that he made to the officer at the scene. 2011 VT 74, ¶ 10, 190 Vt. 195, 27 A.3d 348. We found nothing to suggest that the prosecutor was expressing any personal view of defendant's veracity, and further observed that the prosecutor "simply compared defendant's statements made at the scene with the surrounding evidence to demonstrate the obvious incongruities." Id. ¶ 11. We thus concluded that the prosecutor "was relying on the evidence, not his personal beliefs, to characterize defendant's remarks." Id.; see also State v. Brandt, 2012 VT 73, ¶¶ 26, 28, 192 Vt. 277, 59 A.3d 141 (relying on Kinney to conclude that prosecutor's statement that defendant was "patently" lying in his statement to police was "fair comment" on evidence).

¶ 37. Here, similarly, defendant made statements to the police that were arguably contradicted at trial. The statements were admitted through the investigating officer's testimony and the officer's affidavit and arrest summary, introduced by defendant. The officer testified, and the officer's affidavit reflects, that defendant indicated that he had gone to M.B.'s apartment after leaving the bar, and then went to his son's mother's home. He also identified the "snorting" of Ritalin as a "factor" in the case. None of the other witnesses recalled the use of any drugs that evening other than marijuana, and all testified that defendant not only returned to M.B.'s apartment after their time at the bar, but went to bed there and did not leave until after the sexual assault. Thus, as in Brandt and Kinney, the prosecutor's reference here to defendant's "motive to

18

lie" could reasonably be viewed as fair comment on the evidence at trial. We find no basis, therefore, to disturb the court's ruling, and no grounds to overturn the judgment.

Affirmed.

FOR THE COURT:

_____

Associate Justice