NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 75

No. 2015-288

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Caledonia Unit, |
| | Criminal Division |
| | |
| Gilles Richard | January Term, 2016 |

Robert R. Bent, J.

David E. Tartter, Assistant Attorney General, and Gregory Nagurney, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

David C. Sleigh and Kyle L. Hatt of Sleigh Law, St. Johnsbury, for Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **REIBER, C.J.** In this appeal of his conviction for driving under the influence (DUI), defendant alleges that the trial court made both factual and legal errors. First, he argues that several important factual findings by the court were clearly erroneous. Next, he argues that the court should have suppressed all evidence following his arrest as fruit of the poisonous tree because the trooper who arrested him did so without probable cause. Finally, he argues that the court should have suppressed his evidentiary breath test results because (1) the Vermont State Police trooper deterred him from seeking an independent blood test and (2) the trooper prevented him from seeking an independent blood test by jailing him. We affirm on all issues, upholding defendant's conviction.

¶ 2.    The circumstances underlying this case occurred in Lyndonville on the night of August 8, 2014. While in his cruiser in a parking lot, the trooper observed defendant's truck come up the street, pass through a stop sign intersection without stopping, and then make a right turn. As the trooper began following defendant, he observed defendant drifting to the left and crossing the center of the road. After defendant made a second turn, the trooper activated his lights, signaling defendant to stop. Nevertheless, defendant continued driving for a short distance before finally pulling into his own driveway.

¶ 3.    Defendant exited his car and began walking up the ramp to the front door of his home—despite the trooper's request that he stay with his truck—and the trooper stopped defendant as he attempted to enter his home. The trooper testified: "[W]hile I'm sitting there talking to him, I can smell intoxicants on his breath, his speech is slurred, you know, just not listening to anything I'm saying." The trooper pulled defendant away from the door and escorted him down the ramp to his cruiser. Defendant verbally resisted. According to the trooper, defendant kept telling the trooper "don't do this, don't do this," and each time the trooper told defendant "come on, let's go" defendant responded "nope, nope, nope." The trooper handcuffed defendant, searched him, and put him in the cruiser. Importantly, the trooper did not administer a field sobriety test or a preliminary blood alcohol test; he arrested defendant simply because he "believed he was under the influence of intoxicants."

¶ 4.    At the police barracks, the trooper processed defendant for DUI. Before administering a breath test, the trooper told defendant that he would take him to the hospital for an independent blood test if he intentionally burped to delay the test. Defendant responded, "[E]xcuse me, sir, I'm going there anyway." After defendant completed the breath test, the trooper asked if he wanted a second test, and the defendant replied, "No. Hospital." The trooper then told defendant that the hospital would not administer an independent test unless he paid $75, by either cash or credit card. When defendant said that he did not have either, the trooper told

2

him that he was willing to take defendant to the hospital, but the hospital would "turn [defendant] away . . . you got to have the seventy-five bucks or they refuse to draw without it." Finally, when the trooper told defendant that he was willing to take defendant to the hospital but that defendant would not be able to obtain the test, defendant declined, saying, "Well, I don't have seventy-five bucks, so."

¶ 5. After processing, an incapacitation screener who worked as an "emergency services clinician and care bed team leader" at Northeast Kingdom Human Services came to the barracks to speak with defendant. The screener's task was to evaluate whether defendant should be put in protective custody or instead could be released. This evaluation was based not only on information provided by the trooper—such as defendant's breath test results—but also on defendant's appearance and answers to questions. Defendant refused to answer any of the screener's questions and instead requested that his wife pick him up. Based on this refusal, as well as by looking at defendant's eyes, the screener ultimately recommended that defendant be placed in custody because his "physical or mental functioning was substantially impaired from the consumption of alcohol and/or other drugs" and "[a]t the time there was not anybody there to take custody of him." The trooper then took defendant to the Saint Johnsbury correctional facility, so defendant never received an independent test.

¶ 6. After being charged with DUI, defendant moved to suppress all evidence following his arrest as fruit of the poisonous tree because the trooper who arrested him did so without probable cause. He also moved to suppress his breath test results because the trooper deterred him from seeking an independent test. The court held a two-day hearing on the motions, during which both the trooper and the screener testified. Following the trooper's testimony, defendant further moved to suppress his breath test results on another basis: that the trooper prevented him from seeking an independent test by jailing him. The court denied defendant's motions, defendant moved for reconsideration, and the court again denied the

3

motions. Defendant then entered a conditional guilty plea to DUI, reserving his right to appeal the denial of the motions. The court entered a judgment of guilty and stayed defendant's sentence pending appeal.

I.

¶ 7. Defendant first argues that several important factual findings by the court were clearly erroneous. These findings were that (1) defendant "fail[ed] to maintain his lane" and was "unsteady as he exited his vehicle and as he headed up the ramp of his home"; (2) "The officer repeatedly offered to take Defendant to the hospital. Defendant declined and did not afterwards ask to be taken to the hospital"; (3) "any 'interference' [with defendant's right to an independent test] stemmed from the local hospital and its imposition of fees . . . the officer's testimony was sufficient to establish his experience with the local hospital and the court sees no need to require the State to put on corroborating evidence"; and (4) the trooper placed defendant into protective custody because "if someone he is processing is difficult, he will not 'cut him a break.' "

¶ 8. We review findings of fact for clear error. Vt. Structural Steel Corp. v. S.D. Ireland Concrete Constr. Corp., 137 Vt. 371, 372, 406 A.2d 392, 393 (1979) ("Findings of fact shall not be set aside unless clearly erroneous"). This does not involve a weighing of the evidence. Highgate Assocs., Ltd. v. Merryfield, 157 Vt. 313, 315, 597 A.2d 1280, 1281 (1991) ("A finding will not be disturbed merely because it is contradicted by substantial evidence."). Rather, we uphold the findings if any reasonable and credible evidence in the record supports them. Lawson v. Brown's Home Day Care Ctr., Inc., 2004 VT 61, ¶ 18, 177 Vt. 528, 861 A.2d 1048 (mem.) ("We will not disturb the trial court's factual findings unless they are clearly erroneous, meaning there is no credible evidence in the record to support them."); In re M.B., 2004 VT 58, ¶ 6, 177 Vt. 481, 857 A.2d 773 (mem.) ("The court's findings will stand if there is any reasonable and credible evidence to support them."). This is because "the trial court is in the unique position to assess the credibility of the witnesses and the weight of all the evidence

4

presented." Peckham v. Peckham, 149 Vt. 388, 390, 543 A.2d 267, 269 (1988) (quotation omitted). Without making our own factual findings, we may review both the dashcam video and the processing video to determine whether they contain evidence supporting the court's findings. In re M.K., 2015 VT 8, ¶ 15 n.*, 198 Vt. 233, 114 A.3d 107 (2015) ("[A]lthough we watched the video as part of the record of the proceedings below, our standard for reviewing the . . . court's findings regarding the video are the same as with other evidence presented in the case.").

¶ 9. Here, the contested factual findings are not clearly erroneous because the evidence supports them. First, we address the finding that defendant "fail[ed] to maintain his lane" and was "unsteady" on his feet. Although it is true that the road did not have lanes, and so "lane" may not have been the best terminology for the court to use, defendant certainly failed to stay to his side of the road. And his movement after exiting the truck, his missing of his truck door with his hand, and his use of the railing while stepping up the ramp to his door all support the court's description that he was "unsteady" on his feet. It is not our place to second-guess this finding.

¶ 10. Second, we address the finding that "the officer repeatedly offered to take Defendant to the hospital. Defendant declined and did not afterwards ask to be taken to the hospital." On this point, defendant argues that the court omitted important statements by defendant suggesting that he did in fact want to go to the hospital: (1) that he was "going to [the hospital] anyway"; (2) his statements that he wanted his wife to pick him up; and (3) his final response that "[w]ell, I don't have the 75 bucks, so." Although these statements could be construed to imply that defendant wanted to go to the hospital, it was within the court's discretion in considering the evidence to determine that they do not.

¶ 11. Third, we address the finding that "any 'interference' [with defendant's right to an independent test] stemmed from the local hospital and its imposition of fees . . . the officer's testimony was sufficient to establish his experience with the local hospital and the court sees no

5

need to require the State to put on corroborating evidence." It is defendant's burden to demonstrate that this information was inaccurate, and he simply did not meet this burden at trial. State v. Webb, 2010 VT 54, ¶¶ 4, 5, 188 Vt. 137, 998 A.2d 709 (holding that "[t]he record supports the trial court's conclusion that defendant was neither misled nor improperly deterred" because "defendant [has not] demonstrated that the officer's responses were, in fact, inaccurate; defendant adduced no evidence showing the actual cost of an independent blood test or proving that the $200 figure was inaccurate or misleading.").

¶ 12.    Finally, we address the finding that the trooper placed defendant into protective custody because "if someone he is processing is difficult, he will not 'cut him a break.' " Rather than specifically being a factual finding, in context, this description is more akin to an adoption of the trooper's recitation of what occurred. As the finder of fact, the court has discretion to assess the trooper's credibility and make this adoption.

II.

¶ 13.    Defendant next argues that his arrest was not supported by probable cause, so the court should have suppressed all evidence following his arrest as fruit of the poisonous tree. He points to the facts that (1) the trooper had never before met defendant, and therefore should not have drawn conclusions about his slurred speech because the trooper "had no basis to say if his diction was different than usual" and (2) the trooper did not administer a breath test or field-sobriety test before arresting defendant.

¶ 14.    The U.S. and Vermont Constitutions require that any warrantless arrest be supported by probable cause. State v. Hawkins, 2013 VT 5, ¶ 15, 193 Vt. 297, 67 A.3d 230 ("Under the Fourth Amendment and Article 11, a warrantless arrest must be supported by probable cause."). In assessing whether a warrantless arrest was supported by probable cause, we conduct the same analysis as for issuing a warrant: the facts and circumstances known to the arresting officer must be sufficient to lead a reasonable person to believe that a crime was

6

committed and that the suspect committed it. State v. Arrington, 2010 VT 87, ¶ 11, 188 Vt. 460, 8 A.3d 483; see also State v. Chicoine, 2007 VT 43, ¶ 8, 181 Vt. 632, 928 A.2d 484 (mem.) ("Probable cause for a warrantless arrest requires the same level of evidence needed for the issuance of a warrant."). Importantly, we conduct this analysis according to an objective standard, not a subjective one. State v. Guzman, 2008 VT 116, ¶ 16, 184 Vt. 518, 965 A.2d 544 ("Probable cause depends on whether there are objective facts to support such a finding, not whether the officers subjectively believed there was probable cause.").

¶ 15. The record demonstrates that the trooper had probable cause to arrest defendant. First, the trooper was experienced with drunk drivers: he had made roughly 120 DUI arrests before he arrested defendant. This experience adds weight and credibility to the trooper's observations and inferences drawn from defendant's behavior. See United States v. Arvizu, 534 U.S. 266, 273 (2002) (holding that reasonable suspicion analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person" (quotation omitted)). Second, defendant ignored the trooper's blue lights, drove to his home, further ignored the trooper's command to stay by his truck, and attempted to enter his home. See State v. Partlow, 143 Vt. 33, 37-38, 460 A.2d 454, 456-57 (1983) ("[E]vidence of flight immediately after the commission of an alleged offense is admissible, and if unexplained, tends to show guilt."). Finally, defendant smelled of alcohol, slurred his speech, and was unsteady on his feet. See State v. Gray, 150 Vt. 184, 186, 552 A.2d 1190, 1192 (1988) (affirming DUI conviction where arresting officer observed that "defendant's eyes were bloodshot and watery, his speech slurred, and that he was unsteady on his feet").

¶ 16. We are not persuaded by defendant's arguments regarding his slurred speech and the lack of breath or field sobriety tests. Because slurred speech is objectively indicative of intoxication, police officers may consider it as one factor in their determination of whether a

7

defendant is under the influence. Therefore, defendant's argument that slurred speech should not be considered because it is possible that defendant's speech is always slurred—even when sober—is inapt. State v. Jacques, 130 Vt. 427, 430, 296 A.2d 246, 249 (1972) ("Evidence of objective symptoms supporting the existence of [intoxication] may be sufficient."). With respect to the fact that the officer did not administer a preliminary breath test, we considered an analogous issue in State v. Begins, 148 Vt. 186, 188-89, 531 A.2d 595, 596 (1987). In that case, we held that "[l]aw enforcement officers are not required to offer to, or request of, DUI suspects a breath or blood test as a precondition for prosecution under 23 V.S.A. § 1201(a)(2)." We recognized that evidence of objective symptoms of intoxication other than a blood alcohol assessment can support a prosecution under that subsection. Id. A preliminary breath test may be helpful in establishing probable cause for a DUI charge. See, e.g., State v. Kinney, 2011 VT 74, ¶ 27, 190 Vt. 195, 27 A.3d 348 (noting that both Legislature and Court have recognized that "a PBT bears sufficient utility to establish probable cause to believe that a suspect has been driving while intoxicated"). But it is not essential to establishing probable cause to arrest for DUI. See, e.g., State v. Therrien, 2011 VT 120, 191 Vt. 24, 38 A.3d 1129 (concluding that even without wrongfully obtained preliminary breath test, officer had probable cause to arrest for DUI based on other observations and evidence).

III.

¶ 17. Appellant further argues that the trooper deterred him from seeking an independent test, so the breath test administered by the trooper must be suppressed. The facts relevant to this argument are as follows. After administering the breath test, the trooper asked defendant if he wanted another test, and defendant responded, "No. Hospital." The trooper told defendant that he would have to pay seventy-five dollars before the hospital would administer an independent test, defendant replied that he did not have enough money, and the trooper told him that he was willing to take defendant to the hospital, but the hospital would "turn [defendant]

8

away . . . you got to have the seventy-five bucks or they refuse to draw without it." Finally, the trooper told defendant that although he was willing to take defendant to the hospital, the hospital would not administer the test. Defendant declined, saying, "Well, I don't have seventy-five bucks, so." Defendant argues that these conversations amount to the trooper dissuading him from obtaining the independent test. He contends that—if we hold otherwise—"a person rendered penniless by arrest . . . would have no ability to obtain an independent test, and to avoid the hassle of ever going to the hospital, police would need only to tell a suspect of the futility of seeking a blood-draw with no money."

¶ 18. Under Vermont law, every DUI suspect who has been administered a breath test has the right to seek an independent test:

> A person tested has the right at the person's own expense to have someone of the person's own choosing administer a chemical test or tests in addition to any administered at the direction of the law enforcement officer under section 1203 of this title. . . .

23 V.S.A. § 1203a(a). The results of the police breath test may be suppressed from evidence if the police interfere with this independent test:

> The failure or inability to obtain an additional test or tests by a person shall not preclude the admission in evidence of the test taken at the direction of an enforcement officer unless the additional test was prevented or denied by the enforcement officer.

Id. This independent test is generally performed at the suspect's own expense, unless the facility is unable to get payment from the suspect, in which case it may be reimbursed by the Office of the Defender General:

> The person requesting the sample is responsible for the costs of transportation, drawing the sample, and subsequent analysis. If the facility where the sample is drawn is unable to obtain payment from the person at the time the sample is drawn or within a reasonable time thereafter, the facility shall be entitled to reimbursement from the Office of the Defender General. The Office of the Defender General may recoup those costs and the court may impose conditions of release or probation for that purpose.

Id. § 1203a(e).  Reflecting the importance of this right, Vermont law also requires that every DUI suspect be informed of it:

> At the time a test is requested, the person shall be informed of the following statutory information:
>
> . . .
>
> (4) . . . The person also has the right to have additional tests made by someone of the person's own choosing at the person's own expense.  The person shall also be informed of the location of one or more facilities available for drawing blood.

Id. § 1202(d).

¶ 19.  We addressed the issue of independent tests in State v. Webb, which guides our analysis of defendant's argument.  2010 VT 54, 188 Vt. 137, 998 A.2d 709.  In that case, the police officer processing the defendant for DUI told the defendant that an independent test would be "at your own expense" and could cost "around two hundred" dollars.  Id. ¶ 4.  We found that these statements did not amount to the officer discouraging the defendant from obtaining an independent test because the defendant did not produce any evidence showing that they were "inaccurate or misleading."  Id. ¶ 5.

¶ 20.  Applying this precedent, we find that the court properly denied defendant's motion to suppress his breath test results.  Like the defendant in Webb, defendant simply offered no evidence to counter the trooper's challenged statements.  Had defendant offered evidence at trial that the hospital would not have charged him upfront, then he may have been entitled to suppression of his breath test results on the basis that the trooper had denied him the opportunity to obtain an independent test.  Without such evidence—and relying on the trooper's testimony regarding the hospital's policy—it was within the court's discretion to determine that "any 'interference' [with an independent test] stemmed from the local hospital and its imposition of fees, to the extent that the hospital would have refused to perform a blood draw."  Also, a hospital's refusal to perform an independent test does not violate a defendant's rights under 23

V.S.A. § 1203a. See State v. Benoir, 174 Vt. 632, 633, 819 A.2d 699, 701 (2002) (mem.) ("We find no merit to defendant's contention that an independent hospital's refusal to draw a DUI suspect's blood at the suspect's request is akin to having an additional test prevented or denied by a law enforcement officer.").

¶ 21. Furthermore, we reject defendant's suggestion that Webb stands for the proposition that a police officer may never tell a defendant that he or she must pay for an independent test before its administration. See Webb, 2010 VT 54, ¶ 5 ("The officer did not, for example, suggest that defendant would be compelled to pay for the test at the time of its administration, and defendant acknowledged at the hearing that he was never told that he would be required to pay for the test that night."). Rather, a possible violation of 23 V.S.A. § 1202 emerges only if the officer does so inaccurately, and it is defendant's burden to prove that inaccuracy. Indeed, by its plain language, 23 V.S.A. § 1202(d)(4) specifically required the trooper to inform defendant that an independent test would be at defendant's "own expense." Defendant did not meet his burden to establish the inaccuracy of the information provided by the trooper.

¶ 22. The trooper satisfied this requirement by telling defendant that the hospital would require payment before administering the test. As previously noted, the trooper testified that, to the best of his knowledge, this was the hospital's policy; defendant offered no evidence to the contrary. Moreover, in the absence of any language to the contrary, 23 V.S.A. § 1202 does not require the trooper to inform defendant of the possibility that the hospital would waive the charge and later seek reimbursement from the Office of the Defender General. See State v. Wright, 169 Vt. 573, 573, 740 A.2d 347, 348 (1999) (concluding that "the law enforcement officer was not obligated to inform defendants more fully of the details of the statutory scheme," such as the fact that "an independent chemical test would be paid for by the defender general if not paid for by the suspect").

11

¶ 23.  Appellant finally argues that the trooper prevented him from seeking an independent test by jailing him, so the breath test administered by the trooper must be suppressed.  Importantly, defendant does not focus his argument on the statutory prohibition against interfering with an independent test.  23 V.S.A. § 1203a(a) ("The failure or inability to obtain an additional test [shall not result in suppression] unless the additional test was prevented or denied by the enforcement officer.").  Rather, defendant alleges a constitutional violation; he argues that Article 11 of the Vermont Constitution requires the exclusion of his breath test results because he should have been released rather than placed into custody.  Specifically, defendant first contends that "[Vermont Rule of Criminal Procedure] 3(f) required the Defendant to be released on citation" because DUIs are typically misdemeanors.  V.R.Cr.P. 3(f) (describing that, with certain exceptions, "[a] person who has been arrested without a warrant for a misdemeanor offense shall be released on citation").  Defendant next contends that "the Trooper jailed the Defendant out of vengeance" and "the Screener's purely bureaucratic certification notwithstanding, the record provides no support for the idea that the Defendant was, in fact, incapacitated."

¶ 24.  Eliminating defendant's first contention, the court specifically found that the trooper detained defendant as an incapacitated person under 18 V.S.A. § 4808(b), not as an arrested person under Rule 3(f): "the only basis for continued detention of Defendant was under the ICP process initiated by the officer."  Therefore, the central component of defendant's argument is his second contention: whether his detention as an incapacitated person was proper.  Lending credence to defendant's notion that he was jailed "out of vengeance," the trooper testified that "if someone he is processing is difficult, he will not 'cut him a break.' "  Indeed, after hearing the details of defendant's DUI processing from the trooper, the screener, and

defendant, the court was uncertain whether defendant was improperly detained as an incapacitated person:

> While the court does believe Defendant may have been improperly detained under improper application of the incapacitated persons statute, the court does not know the length of the detention or how such detention may have impacted his ability to go to the hospital for an independent test, particularly where it appears that Defendant's wife could have taken him there.

An improper detention could be a violation of Article 11. Vt. Const. ch. I, art. 11 ("That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure. . . ."); see also State v. Cunningham, 2008 VT 43, ¶ 30, 183 Vt. 401, 954 A.2d 1290 (holding that hours-long detention of defendant to wait for canine unit constituted unlawful seizures under Article 11 absent a reasonable, articulable suspicion). And such a violation would require suppression of evidence resulting from it. State v. Badger, 141 Vt. 430, 452-53, 450 A.2d 336, 349 (1982) ("Evidence obtained in violation of the Vermont Constitution, or as the result of a violation, cannot be admitted at trial as a matter of state law.").

¶ 25. But even if defendant's detention had violated his constitutional rights—a determination we do not make—defendant cannot demonstrate a connection between that hypothetical violation and the suppression of his breath test results. Specifically, the trooper administered the breath test before he detained defendant on the basis of his incapacitation. Therefore, the evidence that defendant seeks to suppress did not result from the constitutional violation that he alleges, but instead came after it. This would not be a proper application of the exclusionary rule. See State v. Hawkins, 2013 VT 5, ¶ 20, 193 Vt. 297, 67 A.3d 230 ("The question in most cases, therefore, is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality." (quotations omitted)); see also Murray v. United States, 487 U.S. 533, 536-37 (1988) ("[T]he exclusionary

rule also prohibits the introduction of derivative evidence . . . that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." (quotation omitted)).

¶ 26. Nevertheless, defendant argues for an expansion of the exclusionary rule so that—under certain circumstances—evidence gathered before constitutional violations is suppressed. He states in his brief that "the exclusionary rule and its purpose is not so limited," so "evidence . . . obtained before a constitutional violation may be properly considered the fruit of a later constitutional violation if that violation interferes with a person's right to challenge the State's evidence." However, defendant cites no cases supporting this argument, and we likewise find none. We therefore conclude that the court properly denied defendant's motion to suppress his breath test results; the alleged constitutional violation occurred after the breath test was administered, so it has no bearing on the admissibility of the breath test results.

Affirmed.

FOR THE COURT:

Chief Justice

¶ 27. **SKOGLUND, J., concurring.** I agree with the majority's legal analysis of all the issues presented in this appeal. I write separately to voice concern for what I perceive as misuse of the incapacitated person statutes. I agree with the court below when it wrote, "[T]he court does believe Defendant may have been improperly detained under improper application of the incapacitated persons statute." And, I express concern about the quality and reliability of the so-called "screening" that took place for defendant.

14

¶ 28.  According to the court below, the only interaction between the screener and defendant was when defendant asked about his wife's anticipated arrival and the screener informed him that his wife was on her way.  Then, the defendant informed the screener that he did not wish to answer her questions.  Quoting from the trial court's decision, "Ms. Aldrich looked at Defendant's eyes and confirmed that he was 'incapacitated.' "  At that point, defendant was shackled and taken to the correctional facility.

¶ 29.  The court below and the majority here agree that the post-arrest and processing events that gave rise to defendant's detention at the correctional facility as an incapacitated person are not connected with the evidence of impairment that defendant sought to suppress.  I can agree with that legal assessment.

¶ 30.  However, if one considers the statutory enactments relied upon, it gives this writer pause.  Chapter 94 of Title 18 of the Vermont Statutes Annotated describes the policy and programs for addressing alcohol and drug abuse in Vermont.  In 18 V.S.A. § 4802, we find definitions.  Under § 4802(7),

> "Incapacitated" means that a person, as a result of his or her use of alcohol or other drugs, is in a state of intoxication or of mental confusion resulting from withdrawal such that the person:
>
> (A) appears to need medical care or supervision by approved substance abuse treatment personnel . . . to assure his or her safety; or
>
> (B) appears to present a direct active or passive threat to the safety of others.

¶ 31.  Nothing in the record supports a conclusion that defendant was incapacitated as defined in the statute such that he should have been incarcerated or taken into protective custody pursuant to 18 V.S.A. § 4808.

¶ 32.  The screener claimed to identify incapacitation as described in the statute after one cogent, appropriate inquiry from defendant followed by his declining to answer her

15

questions and after "looking in his eyes." Really? Where is the evidence of mental confusion or a need to assure his safety? See id. § 4802(7). But, claiming to rely on this assessment, the officer then implemented his authority under § 4808 to take defendant into protective custody, notwithstanding the fact that defendant's wife was on her way, at least according to the screener.

¶ 33. I would point out further that defendant had the capacity to make repeated decisions of legal import during processing, he was calm, compliant and nonthreatening throughout his time at the barracks, and he had the ability to take an evidentiary breath-alcohol test. Those facts do not support a conclusion that the defendant was incapacitated.

¶ 34. Chapter 94's purpose is to ensure "alcoholism and alcohol abuse are correctly perceived as health and social problems rather than criminal transgressions." Id. § 4801(a). The negligible screening of defendant subverts this policy, rather than furthering it. We must always be guided by the "whole of the statute and every part of it, its subject matter, the effect and consequences, and the reason and spirit of the law." In re P.S., 167 Vt. 63, 70, 702 A.2d 98, 102 (1997).

¶ 35. I am authorized to state that Justice Robinson joins this concurrence.

_____

Associate Justice

16