NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 39

No. 22-AP-225

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Theodore Dmitri Colehamer | April Term, 2023 |

John R. Treadwell, J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **CARROLL, J.** Defendant Theodore Colehamer appeals two convictions following a jury trial—felony driving under the influence (DUI), fourth offense, and misdemeanor eluding a police officer. He contends that the trial court abused its discretion in denying defense counsel the opportunity to ask a question of potential jurors at voir dire, that it made multiple errors on evidentiary rulings, and that it improperly selected a jury foreperson. He also argues that the eluding conviction should be vacated because he did not violate the statute's plain terms. We conclude that the court did not abuse its discretion on any of the evidentiary or jury issues but agree with defendant that he did not elude law enforcement as charged. Accordingly, we affirm the DUI conviction and vacate the eluding conviction.

## I. Background

### A. Facts

¶ 2.     The following is drawn from witness testimony and exhibits introduced at trial.  At approximately 11:30 p.m. on April 19, 2019, Brattleboro Police Officer Bradley Penniman saw defendant sitting on an electric scooter.  The scooter was positioned on a sidewalk and was stationary.  The officer stopped his marked police cruiser a short distance away and approached defendant on foot.  Officer Penniman was in uniform and had activated his body camera.  Penniman told defendant he could not ride on the sidewalk and asked whether defendant had consumed any alcohol that evening.  Defendant said that he had not.  Penniman then asked for defendant's driver's license.  Defendant initially responded that he did not have his license with him, but then remembered that he did have it and gave it to Penniman.  Penniman, noticing the smell of alcohol and defendant's "confusion" and "slurred speech," asked defendant to "hang tight" while he went back to activate the cruiser's dash camera.  As Penniman did so, defendant drove away on the scooter.  After he realized defendant had left, Officer Penniman got in the cruiser, activated its emergency lights, but not the siren, and attempted to locate defendant in the area, including at defendant's nearby residence.

¶ 3.     Shortly thereafter, Penniman spotted defendant, who was no longer on the scooter, and arrested him after a brief foot chase.  Upon returning to the stationhouse, Penniman read defendant Miranda warnings and defendant indicated that he was not waiving them.  Penniman told defendant that he was not going to administer field-sobriety tests because defendant had not waived Miranda rights.  Defendant agreed to provide an evidentiary breath-alcohol sample.  Penniman used a DataMaster DMT breath-alcohol testing device to determine defendant's BAC, which was .103 at 1:11 a.m.  At 1:16 a.m., a second test obtained a result of .106.  Defendant consented to a search of his backpack in which Penniman found 1.21 ounces of marijuana, plastic baggies, and a scale.

2

B.  Pretrial

¶ 4.    As amended, defendant was charged with driving under the influence of intoxicating liquor, fourth offense, in violation of 23 V.S.A. § 1201(a)(2); operating a motor vehicle with an alcohol concentration of 0.08 or more, fourth offense, in violation of 23 V.S.A. § 1201(a)(1); and one count of eluding a police officer in violation of 23 V.S.A. § 1133(b)(1).

¶ 5.    During voir dire, defense counsel wanted to ask the following question of potential jurors: "what is worse: an innocent person being convicted or a guilty person going free?"  The State objected and argued that the question was designed to inflame the jury.  The trial court refused to allow the question, stating that it "didn't find it an appropriate question to ask."  The court ruled that the question could "lead the jury to speculate about" unrelated matters.

¶ 6.    Immediately preceding trial the next day, the court held a hearing on defendant's motion for permission to ask Officer Penniman questions relating to a "Brady letter" prepared by the Windham County State's Attorney in June 2021.[1]  The letter disclosed the following:

> Brattleboro Police Officer Bradley Penniman prepared an affidavit of probable cause in [a] case . . . which contains a material misstatement.  The affidavit states that a notice of hearing containing defendant's name was in a bag containing drugs when that notice was found in a different bag.  That location was relayed to him from another officer, but he does not remember which officer and no other officer recalls making the statement.

Defendant contended that, based upon the contents of the letter, he should be allowed to put the question of Officer Penniman's credibility to the jury under Vermont Rule of Evidence 608(b). The State countered that there was no evidence indicating Officer Penniman's misstatement was untruthful; thus, it was not an appropriate question for the jury.  The State also argued that the

---

[1]  Brady refers to Brady v. Maryland, 373 U.S. 83, 87 (1963), a case in which the U.S. Supreme Court held in relevant part that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."

letter was not relevant given that the State's evidence in the case was independently supported by body-camera footage, which meant that the jury was not relying on the officer's testimony alone.

¶ 7.    The court denied the motion. It ruled that while Penniman's affidavit contained a factual inaccuracy, it was inaccurate because the information conveyed to Penniman was inaccurate, not because Penniman was untruthful. Accordingly, the misstatement was not probative of his truthfulness and defendant could not pursue a line of questioning regarding the Brady letter.

## C. Trial

¶ 8.    The State called Officer Penniman as a witness at trial. It asked Penniman to recite defendant's date and place of birth. Penniman indicated that he needed to be refreshed to correctly answer the question. The State provided him with a copy of defendant's Vermont Arrest Custody Report. The State repeated the question after Penniman had reviewed the document, and Penniman answered. The State then asked how he learned of defendant's place of birth, to which Penniman responded, "by looking at his criminal history record." At that point, defendant moved for a mistrial because, he argued, the State had elicited testimony concerning defendant's "criminal history." He contended this was irrelevant and prejudicial. The State responded that it did not intend to elicit that answer and was not going to draw attention to it. It suggested that either the court could issue a curative instruction to the jury to disregard Officer Penniman's testimony or it could simply continue on direct examination as if nothing had happened. The court asked defense counsel for his request, and counsel responded, "our request is for mistrial . . . we don't want a curative instruction." The court ruled that the reference to defendant's criminal and arrest history was brief, did not allude to what defendant's criminal history was, if any, and was not overly prejudicial. Accordingly, it denied the motion for mistrial.

¶ 9.    On cross-examination of Officer Penniman, defendant pursued a line of questioning focused on the amount of marijuana he found in defendant's backpack. The State objected when

4

defendant sought to raise the issue of whether the amount of marijuana Penniman found in the backpack constituted a criminal amount. Defendant's theory of the case was that he was not intoxicated at the time of the incident, and his behavior stemmed from his nervousness at knowing he had a criminal amount of marijuana in his backpack. The court denied defendant's request to introduce the issue of whether the amount was criminal but permitted defendant to elicit testimony from Penniman that he found 1.21 ounces of marijuana, baggies, and a scale in defendant's backpack.

¶ 10. Defendant next sought to question Penniman about why he refused to administer field-sobriety tests; specifically, that Penniman apparently misunderstood that a refusal to waive Miranda rights does not foreclose the administration of field-sobriety tests. The State objected on the grounds that why Penniman refused—his mistaken understanding of the law—was not relevant to the issues before the jury. According to the State, whether Penniman provided defendant an opportunity to perform field-sobriety tests was the only relevant issue. Defense counsel responded that Penniman's mistake went to impeaching Penniman's investigation and deprived defendant of an opportunity to prove he was not intoxicated. The court refused to allow defense counsel to raise the issue but did permit him to ask Penniman whether he afforded defendant the opportunity to perform field-sobriety tests, to which Penniman said, "no."

¶ 11. Following cross-examination, the court asked whether any members of the jury had any questions for Penniman. One juror asked the following: "Why are you obligated to offer a field-sobriety test by law." At a bench conference, defense counsel indicated that he did not want the court to ask the question, and the court responded that "there is no evidence regarding field sobriety tests" and the jury "cannot rely [on the question presented] to determine either sobriety or a lack of sobriety. I'm not going to answer the question." Defense counsel said, "I agree" and reiterated his objection that he should be allowed to raise the issue of Penniman's mistaken view of the law, which the court continued to overrule.

5

¶ 12. The State's next witness was a forensic chemist from the Vermont Forensic Laboratory. During her testimony, the State sought to introduce a copy of defendant's evidentiary breath-test results called a DataMaster ticket. Defendant objected and, on voir-dire examination, posed the following question to the chemist: "Would you agree that [defendant's test results] are likely not the numbers [defendant] had in his system at the time of operation?" The State objected, arguing that the question involved relating back defendant's BAC to the time of operation rather than contesting the foundation facts. Defendant responded that his line of questioning was intended to elicit testimony from the chemist regarding defendant's impairment at the time of operation in the absence of any evidence of defendant's drinking pattern prior to his encounter with Officer Penniman. The court asked defense counsel why, given that under 23 V.S.A. § 1204(a)(3) a test result of 0.10 or more within two hours of the offense is a permissive inference that a person was under the influence of alcohol at the time of operation, the test results were not admissible. Counsel responded that he considered the results "admissible to the influence charge, but not necessarily to the legal[-]limit charge." The court noted that "relation back is a different issue." Counsel accordingly withdrew his objection, and the court admitted the test results.

¶ 13. Defense counsel then asked whether the court would allow hypotheticals regarding defendant's level of intoxication at the time of the offense. The State requested one hypothetical—that defendant did not consume alcohol in the thirty minutes prior to operation. It argued that this hypothetical was supported by the record, including defendant's untrue statement to Officer Penniman that he had not consumed any alcohol. Defense counsel requested a hypothetical that assumed defendant had consumed "two standard drinks" in the thirty minutes prior to the offense.

¶ 14. Following a recess, the court ruled that there was no evidence to support either hypothetical. Defendant had represented to Officer Penniman that he did not consume any alcohol, and therefore the probative value of posing a relation-back hypothetical to the jury was "effectively nil" because "there was nothing to relate back" to. The court noted that it "would allow a single

6

hypothetical based upon the evidence, which would be what . . . defendant's" BAC would "be based upon zero units of alcohol consumed" in the twelve hours prior to the incident. Defense counsel objected, apparently believing that the court's ruling was tantamount to giving the State "the extreme of the hypotheticals" because the jury could infer that having no drinks meant that defendant was "completely done absorbing alcohol." The court clarified that "there [was] no drinking pattern . . . in the record from which a retrograde extrapolation can be conducted. Any hypothetical, either consuming no alcohol in the thirty minutes beforehand or consuming potentially two drinks in the thirty minutes beforehand, is not supported by the evidence." Defense counsel then asked whether the court would admit the chemist's affidavit, which contained a relation-back analysis similar to the hypothetical posed by the State. The court responded, "how could it come in?" Counsel then acknowledged that he had "completely misunderstood" the court's ruling, but now that he understood that the court was not admitting any relation-back hypotheticals, he would "not be putting any hypothetical or numbers up to the jury about [defendant's] alcohol concentration."

¶ 15. At the close of the State's evidence, the court granted defendant's motion for a judgment of acquittal on the "legal[-]limit count," which requires a BAC of .08 or higher at the time of operation. See 23 V.S.A. § 1201(a)(1). Because the court "precluded the parties from asking questions based upon hypotheticals based upon the absence of evidence in the record," there was "no evidence from which the jury could reasonably conclude that" defendant's BAC was above the legal limit "at the time of operation."

¶ 16. The court denied the motion as to the eluding-law-enforcement count. The statute's requirement that "[n]o operator of a motor vehicle shall fail to bring his . . . vehicle to a stop when signaled to do so by an enforcement officer," applied here because, the court ruled, Officer Penniman's direction to "hang tight" was a "clear direction" to defendant to "stay where he [wa]s." See 23 V.S.A. § 1133(b)(1). The court interpreted the statutory language "to be the equivalent

7

of . . . precluding an individual from starting their vehicle," and concluded that the State had offered substantial admissible evidence in support of the charge.

¶ 17. While discussing jury instructions, defendant objected to the court's procedure for choosing a jury foreperson. The court indicated that it chose a foreperson based on who appeared to pay attention during trial, rather than by lot or by the jury's own choosing. Defendant suggested that the court's procedure risked signaling to the jury and the foreperson that the foreperson's "opinion will be given more weight than the other jurors." The court noted that the rules of procedure granted it "the discretion to use whatever procedure" it considered "fair in selecting a foreperson" and that it would not change its practice.

¶ 18. The jury returned guilty verdicts on the two remaining charges. Defendant was sentenced to a term of twelve-to-eighteen months, all suspended, with nine days to serve, and a twelve-month probation term. Following the court's denial of his motion for a new trial and renewed motion for judgment of acquittal on the eluding charge, defendant appealed.

D. Arguments on Appeal

¶ 19. Defendant advances numerous arguments relating to the court's evidentiary rulings. He contends that the court erroneously limited his cross-examination of the chemist, prevented questions relating to the amount of marijuana he had in his backpack and why Penniman had refused to perform field-sobriety exercises, and prohibited him from impeaching Penniman's credibility. He contends that the court erred by denying his motion for a mistrial following Officer Penniman's reference to his criminal history. He argues that the court abused its discretion when it prohibited him from asking potential jurors his proposed question and by appointing a jury foreperson based on who it considered to have paid attention during the trial. Finally, he argues that the State failed to establish that he was guilty of eluding an enforcement officer.

¶ 20. We conclude that defendant's arguments relating to the court's evidentiary rulings are without merit, and that he failed to preserve an objection with respect to his cross-examination

8

of the chemist. We further conclude that the court did not abuse its discretion at voir dire or in its manner of selecting a jury foreperson. The court likewise did not err when denying defendant's motion for a mistrial. However, we agree that the State failed to establish that defendant violated 23 V.S.A. § 1133(b)(1). The statute requires an operator to "fail to bring his or her vehicle to a stop when signaled to do so by an enforcement officer." Id. Defendant did not fail to bring his scooter to a stop after being signaled to do so. He was stationary when Officer Penniman approached, and defendant's leaving despite Penniman's statement to "hang tight," considering the surrounding facts and circumstances, cannot sustain a conviction on the eluding charge.

## II. Evidentiary Arguments

¶ 21. Defendant raises several claims of error regarding the trial court's evidentiary rulings. We address each in turn.

¶ 22. "We apply a deferential standard of review to the trial court's evidentiary rulings and will reverse its decision only when there has been an abuse of discretion that resulted in prejudice." State v. Russell, 2011 VT 36, ¶ 6, 189 Vt. 632, 22 A.3d 455 (mem.) (quotation omitted).

### A. DataMaster Ticket

¶ 23. Defendant first contends that the trial court abused its discretion when it admitted the DataMaster ticket and instructed the jury to presume defendant was under the influence while not permitting defendant to challenge the test results. We conclude that defendant failed to preserve his objection to the ruling and decline to address it on the merits.

¶ 24. Defense counsel, responding to the court's ruling that neither party could pose relation-back hypotheticals to the chemist, asked whether the court would admit the chemist's affidavit, which contained an extrapolation assuming defendant had no drinks in the thirty minutes prior to the incident. The court responded, "how could it come in?" Defense counsel then said, "[I] will not be putting any hypothetical or numbers up to the jury about [defendant's] alcohol

9

concentration" and apologized that he had "completely misunderstood" the court's ruling. The court responded, "I think that's fair given the record. Okay. Are we ready to resume with the jury?" Defense counsel responded in the affirmative, the jury came back in, and the proceedings continued. Based on this colloquy, defense counsel effectively withdrew his objection and therefore "waived his right to a review of the court's ruling on appeal." State v. Poutre, 154 Vt. 531, 535, 581 A.2d 731, 734 (1990); see also State v. Spooner, 2010 VT 75, ¶ 19, 188 Vt. 356, 8 A.3d 469 ("By agreeing to [a court's evidentiary ruling], a party waives his right to review of the trial court's ruling on appeal.").

### B. Marijuana and Field-Sobriety Tests

¶ 25. Defendant next contends that the court erred when it refused his request to ask Penniman whether the amount of marijuana in his backpack could have constituted a crime, and his request to ask why Penniman refused to administer field-sobriety tests to defendant. The court did not abuse its discretion on either question.

¶ 26. Evidence is relevant if it has any tendency to make the existence of a consequential fact more or less probable than it would be without the evidence. V.R.E. 401. As defendant concedes, trial courts enjoy broad discretion in determining whether evidence is relevant. See State v. White, 172 Vt. 493, 500, 782 A.2d 1187, 1192 (2001) ("The determination as to whether evidence one party seeks to admit is relevant is committed to the sound discretion of the trial court, and we will not disturb its decision absent a showing of an abuse of discretion." (quotation omitted)); see id. ("This Court will not interfere with discretionary rulings of the trial court that have a reasonable basis, even if another court might have reached a different conclusion, nor will we interfere with the judgment of the trial court simply because a different court might have reached a different conclusion." (quotation omitted)). A court's discretion is "limited in criminal cases by defendant's constitutional due process rights and right to confront witnesses against him." State v. Memoli, 2011 VT 15, ¶ 23, 189 Vt. 237, 18 A.3d 567 (quotation omitted).

¶ 27. Evidence concerning whether defendant was in possession of an amount of marijuana that could have been charged as a misdemeanor at the time would not make the fact of defendant's purported nervousness more probable than without it.[2] The court permitted defense counsel to elicit from Officer Penniman testimony affirming that defendant possessed 1.21 ounces of marijuana, plastic baggies, and a scale. Defense counsel also referred to the amount and paraphernalia in his opening and closing arguments. We agree with the court that, in light of the evidence defendant was permitted to bring in, any additional probative value of characterizing the amount of marijuana as a criminal amount was "extremely minimal," and did not constitute an abuse of discretion. White, 172 Vt. at 500, 782 A.2d at 1192 ("To support a claim of abuse of discretion, the complaining party has the burden to show that the trial court withheld its discretion or exercised its discretion upon grounds clearly untenable or unreasonable.").

¶ 28. Defendant next contends that the court's denial of his request to cross-examine Penniman on his refusal to administer field-sobriety tests was an abuse of discretion. There is no dispute that Penniman was mistaken when he conditioned administering field-sobriety tests on defendant's waiver of Miranda rights. See State v. Farrow, 2016 VT 30, ¶ 13, 201 Vt. 437, 144 A.3d 1036 (noting that field-sobriety tests elicit physical, not testimonial, responses from test-takers and therefore do not "trigger the privilege against self-incrimination" which Miranda seeks to protect). Defendant sought to raise the issue in order to undermine Penniman's credibility.

¶ 29. Whether to administer field-sobriety tests is a discretionary decision by an officer made in the course of an investigation, not a right of persons accused of DUI. Field-sobriety tests are not required to establish probable cause to arrest a driver for DUI.[3] State v. Richard, 2016 VT

---

[2] In April 2019, the possession of more than once ounce of marijuana was chargeable as a misdemeanor. 2017, No. 86 (Adj. Sess.), § 3. The Legislature subsequently decriminalized the possession of less than two ounces of marijuana. 2020, No. 167 (Adj. Sess.), § 32.

[3] To the extent defendant argues that the juror's question, "[w]hy are you obligated to offer a field sobriety test by law," is suggestive of an error by the court, defendant failed to preserve an

75, ¶ 16, 202 Vt. 519, 150 A.3d 1093 (recognizing that evidence of objective symptoms of intoxication without preliminary breath test or field-sobriety tests can alone support prosecution under DUI statute). Nonetheless, while Penniman was mistaken when he told defendant that he could not administer the tests because defendant had refused to waive Miranda rights, defendant was permitted to elicit from Penniman that he did not provide defendant an opportunity to take the tests. We agree with the trial court that the reason why Penniman chose not to administer the tests is not relevant to the fact that he did not administer them.

## C. Brady Letter

¶ 30. Defendant next argues that the court erred in denying his request to question Officer Penniman regarding the details of a prior probable-cause affidavit disclosed in the Brady letter. A court may, in its discretion, permit specific instances of witness conduct to "be inquired into on cross-examination" if probative of the witness's "character for truthfulness or untruthfulness." V.R.E. 608(b); see State v. Lawrence, 2013 VT 55, ¶ 7, 194 Vt. 315, 80 A.3d 58 (quoting United States v. Riggio, 70 F.3d 336, 339 (5th Cir. 1995) for proposition that "evidence of specific conduct may be inquired into on cross-examination of a witness pursuant to Rule 608(b) only 'if the evidence tends to test the truthfulness of testimony given on direct examination' as to a material issue of the case"). A "court has broad discretion to exclude extrinsic evidence introduced to impeach a witness on a collateral matter." State v. Bergquist, 2019 VT 17, ¶ 33, 210 Vt. 102, 211 A.3d 946. However, the court's discretion is limited by the Confrontation Clause of the Sixth Amendment to the United States Constitution, the purpose of which "is to give the opponent the

---

objection to it. Defense counsel said he did not want to pose the question to Penniman and agreed that the court should not answer it. Spooner, 2010 VT 75, ¶ 19 ("By agreeing to [a court's evidentiary ruling], a party waives his right to review of the trial court's ruling on appeal."). Defense counsel did reiterate that he wanted to tell the jury he thought Penniman "should have given" defendant the opportunity to take the tests, and "that is relevant to this case," but the court did not allow him to do so.

chance to test the truth and accuracy of a witness'[s] testimony and expose a witness'[s] motivation in testifying." Id. ¶ 31 (quotation omitted).

¶ 31. The threshold issue here is whether the probable-cause affidavit detailed in the Brady letter contained representations probative of Officer Penniman's untruthfulness. Defendant contends that Penniman "was caught lying," and the state's attorney was forced to disclose "his sworn inaccuracies to the defense bar." Despite his argument, however, the court found that, while containing "factually [in]accurate" statements regarding the location of certain evidence, another officer had relayed those inaccurate statements to Officer Penniman, and it therefore could not "find that the statement [was] inaccurate because it [was] based on information that was conveyed to Officer Penniman that happened to be inaccurate." We cannot conclude, and defendant does not appear to argue, that this finding is clearly erroneous. See Mullin v. Phelps, 162 Vt. 250, 260, 647 A.2d 714, 720 (1994) (noting that factual findings are upheld unless party can show that there is no credible evidence supporting finding and that we do not make credibility findings de novo). Accordingly, the court did not abuse its discretion in concluding that the incident detailed in the Brady letter was not probative of Penniman's unthruthfulness and was therefore not an appropriate subject for cross-examination at trial.[4] See State v. Quiroz, 171 Vt. 509, 511, 757 A.2d 464, 466 (2000) (mem.) (concluding that court did not abuse its discretion under Rule 608(b) in limiting cross-examination regarding specific instances of stealing but permitting it concerning specific instances of lying about stealing).

---

[4] For the same reason, the federal cases defendant cites are inapposite because they involve witnesses who had either lied under oath or were found to be not credible in previous proceedings. United States v. Cedeno, 644 F.3d 79, 81 (2d. Cir. 2011) (concluding district court erred by not permitting cross-examination of witness about prior incident involving lying under oath but holding that error was harmless); United States v. Woodard, 699 F.3d 1188, 1192, 1199 (10th Cir. 2012) (reversing and remanding to permit cross-examination of witness concerning prior incident in which court found state official not credible regarding material issue).

## D. Mistrial Motion

¶ 32.   Defendant next contends that the trial court should have granted his motion for a mistrial because Penniman's unsolicited testimony referencing defendant's criminal history unfairly prejudiced his defense.  In response to the State's question, "how did you ascertain the defendant's place of birth," Penniman testified, "by looking at his criminal history record."

¶ 33.   "We review the denial of a motion for mistrial for abuse of discretion."  State v. Pettitt, 2014 VT 98, ¶ 6, 197 Vt. 403, 104 A.3d 85.  The moving party bears the burden of demonstrating that a denial has resulted in prejudice.  State v. Covell, 142 Vt. 197, 199, 453 A.2d 1118, 1119 (1982).  Prejudice "depends on the facts and circumstances of each case, and therefore we review the denial of the motion for mistrial within the context of the entire proceedings."  Pettitt, 2014 VT 98, ¶ 6 (quotation and brackets omitted).  "The trial court is in the best position to assess whether any comment, in the context of the trial before, is prejudicial enough to warrant a new trial."  Id. (quotation omitted).  A "significant" factor in determining whether a court abused its discretion in denying a mistrial motion is whether "the defendant failed to request a curative instruction . . . or refused the court's offer to give one."  Id. ¶ 9.

¶ 34.   The court exercised its discretion, denying defendant's motion and finding that Penniman's testimony was "brief," did "not identify what that history was in any way," and was "not overly prejudicial."  We agree.  Defendant has not demonstrated that Penniman's statement caused any incurable prejudice.  Indeed, he declined an offer from the court to give the jury a curative instruction.  Defendant's citation to State v. Goodrich, 151 Vt. 367, 564 A.2d 1346 (1989), does not help him.

¶ 35.   In Goodrich, the State sought and obtained permission under Vermont Rule of Evidence 609 to introduce eight previous convictions to impeach the defendant's testimony that he was too intoxicated to form the requisite intent to commit the crime with which he was charged.  Five of the eight convictions were the same as the charge for which he was on trial.  The court

14

gave the jury an instruction explaining that they could only use the convictions to assess the defendant's credibility. We reversed, explaining that "impeachment by prior convictions is extremely prejudicial to the defendant in a criminal case." Id. at 372, 564 A.2d at 1349. We explained that courts should "carefully" exercise their discretion in ruling on whether to permit the State to impeach a defendant, and applied a four-factor analysis to assess whether the trial court had abused its discretion. Id. at 372-73, 564 A.2d at 1349-50. We recognized that "an especially severe possibility of prejudice" exists when prior crimes are introduced similar to the crime for which the defendant is accused; "extensive recitation[s]" of prior crimes is "likely to be highly prejudicial"; the length of time elapsed since the prior crimes is important; and that "[i]f the defendant has no means of defense other than his own testimony, and the fear of impeachment is likely to prevent him from testifying, a court may be reluctant to permit such impeachment." Id.

¶ 36. This situation could hardly be more different. No information about defendant's prior convictions was introduced, much less an "extensive recitation." Defendant has not shown that he harbored any fear of impeachment that was likely to prevent him from testifying. Furthermore, the court offered to give a curative instruction to the jury and defendant refused. As we have previously held, "any potential prejudice to the defendant could be reduced in large part by the court's prompt issuance of a curative instruction." Pettitt, 2014 VT 98, ¶ 9. Taken together, we readily conclude that the court did not abuse its discretion in denying defendant's motion for a mistrial. State v. Gemler, 2004 VT 3, ¶ 16, 176 Vt. 257, 844 A.2d 757 (noting that court's discretion in this context "not abused unless the court entirely withholds it or exercises it upon grounds that are clearly untenable or unreasonable").

### III. Jury Arguments

### A. Voir Dire

¶ 37. Defendant's next argument is that the trial court abused its discretion when it refused to permit him to ask the following question of potential jurors: "what is worse: an innocent

15

person being convicted or a guilty person going free?" He maintains that the question was crafted to root out bias in jurors that could prejudice him and asserts the court had no basis in denying him the opportunity to put the question to them. He contends this error is the kind of "extraordinary circumstance[]" we have previously said was required to reverse. Woodmansee v. Stoneman, 133 Vt. 449, 456, 344 A.2d 26, 30 (1975). We disagree.

¶ 38. "The nature and scope of voir dire is within the sound discretion of the trial court, and decisions regarding voir dire will be reversed only where the court abuses its discretion." State v. Bernier, 157 Vt. 265, 267, 597 A.2d 789, 790 (1991). Here, the court explained that the question was confusing because it could "lead the jury to speculate about" matters unrelated to the issues at hand. We conclude that this alone is a reasonable ground to refuse the question. We note that the question as posed does almost nothing to ascertain whether jurors will be fair and impartial. See State v. Atherton, 2016 VT 25, ¶ 10, 201 Vt. 512, 144 A.3d 311 (explaining that defendants' right to trial by impartial jury is safeguarded by courts' gatekeeping function to exclude "from the jury persons who evince bias against defendant" (quotation omitted)). Further, the question is unfair in that it assumes one of the two scenarios given is necessarily of greater concern than the other, a premise which is unsupported.

## B. Jury Foreperson

¶ 39. Defendant also claims that the court erred in its manner of selecting a foreperson, which the court did by choosing a person it concluded had paid attention during trial. Defendant contends that this procedure risks conferring special influence on the foreperson which could corrupt the jury's deliberations. He cites a law review article which stands for the proposition that where a trial judge appoints a foreperson in a nonrandomized manner, such a practice is a "blatant" violation of the Sixth Amendment right. However, he does not cite 12 V.S.A. § 1944, "appointment of jury foreman," which provides: "In the trial of a cause in the Superior Court by jury, the court shall appoint one of the jurors foreman at the time such cause is submitted." This

16

omission is fatal to defendant's argument. "An appellant's principal brief must contain 'the issues presented, how they were preserved, and appellant's contentions and reasons for them—with citations to the authorities, statutes, and part of the record on which appellant relies.' " Kelly v. Univ. Vt. Med. Ctr., 2022 VT 26, ¶ 29, __ Vt. __, 280 A.3d 366 (quoting V.R.A.P. 28(a)(4)(A)). Because defendant does not cite or discuss the controlling statute governing procedures for selecting jury forepersons, we do not reach the merits of his argument.

### IV. Eluding a Police Officer

¶ 40. Defendant's final argument is that his conviction for eluding law enforcement should be vacated because the State did not and cannot prove beyond a reasonable doubt that he committed that crime. We agree.

¶ 41. The court's denial of a judgment of acquittal is subject to de novo review. State v. Berard, 2019 VT 65, ¶ 7, 211 Vt. 39, 220 A.3d 759. "We consider whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." Id. (quotation omitted). We review questions of statutory interpretation de novo. State v. Eldredge, 2006 VT 80, ¶ 7, 180 Vt. 278, 910 A.2d 816.

¶ 42. Section 1133 of Title 23, "[e]luding a police officer," provides:

(a) No operator of a motor vehicle shall fail to bring his or her vehicle to a stop when signaled to do so by an enforcement officer:

(1) displaying insignia identifying him or her as such; or

(2) operating a law enforcement vehicle sounding a siren and displaying flashing blue or blue and white signal lamp.

The trial court interpreted the term "fail to bring his . . .vehicle to a stop when signaled" "to be the equivalent of . . . precluding an individual from starting their vehicle" after they have been directed

17

to "hang tight."[5] The court's interpretation is not supported by the plain language of the statute. State v. Masic, 2021 VT 56, ¶ 16, 215 Vt. 235, 261 A.3d 646 ("When the plain language of the statute clearly indicates legislative intent," which is the touchstone of statutory interpretation, "we implement the statute according to the plain language." (quotation omitted)).

¶ 43.    We conclude that to bring a motor vehicle to a stop under § 1133 necessarily means that the vehicle must first be in motion. Thus, to fail to bring a vehicle to a stop when signaled means that an operator is being signaled to stop while the vehicle is in motion, and the operator fails to stop despite the signal. Those requirements are not present here.

¶ 44.    Officer Penniman first approached defendant when defendant was stationary. The two engaged in a brief colloquy before Penniman told defendant to "hang tight" while Penniman left to activate his cruiser camera. Only when Penniman turned to walk away did defendant leave. Officer Penniman then activated his lights, but not his siren, and did not otherwise signal for defendant to stop. Accordingly, because defendant did not fail to bring his vehicle to a stop when signaled to do so by an enforcement officer, the State cannot prove defendant violated the statute.

¶ 45.    We are unpersuaded by the State's arguments concerning the possible negative consequences of interpreting the statute according to its plain language. It imagines that an enforcement officer "who has probable cause to believe an operator is impaired and operation is imminent" must "wait to stop the person until after the vehicle starts moving" before § 1133 applies. An officer with probable cause to believe an operator is impaired can and should take appropriate steps to prevent the operator from driving, not wait to obtain additional probable cause to charge the person with eluding. The State also contends that once stopped after being signaled to do so, an operator can drive off again without repercussion, endlessly complying with the statute

---

[5] In its order denying defendant's renewed motion for judgment of acquittal, the court reasoned that "Penniman's instruction for defendant to remain in a particular location amounted to a stop."

18

in a farcical game of hide-and-go-seek. This unfairly reduces the facts of this case to an absurdity. Penniman could have signaled defendant to stop while defendant was in motion under (a)(1) or activated the cruiser's lights and siren while defendant was in motion under (a)(2). See State v. Roy, 151 Vt. 17, 25-26, 557 A.2d 884, 889-890 (1989) (holding that § 1133 is strict-liability crime), overruled on other grounds by State v. Brillon, 2008 VT 35, ¶ 13, 183 Vt. 475, 955 A.2d 1108. Penniman did neither and we refuse to extend the operation of this statute beyond the Legislature's intent, which is evidenced by its plain language.[6]

¶ 46. Similarly, the cases on which the trial court relied and the State defends on appeal, are distinguishable. In each, operators fled after police had signaled them to stop. See State v. Williams, 2009 Ohio 4031, ¶ 7 (describing operator who, while looking "straight" at law-enforcement officer who told him to "not turn that car on," turned car on, reversed into cruiser and fled while being chased by cruiser with lights and sirens activated); State v. Bradley, 2015 Ohio 5421, ¶¶7-8, 55 N.E.3d 580 (describing operator who "jammed the gas to go backwards" away from "multiple" cruisers with their lights and sirens activated, and continued to flee while being monitored by police helicopter).[7] The fact that in each case the vehicles were initially stationary

---

[6] We note, without deciding, that the State may have had other charge options here. See, e.g., State v Blanchard, 2021 VT 13, ¶ 46, 214 Vt. 225, 256 A.3d 567 (discussing 13 V.S.A. § 3001, "impeding police officers"). The State appeared to concede as much in its closing argument: "The State recognizes that this statute [23 V.S.A. § 1133] is probably not the best fit for what the defendant did."

[7] The Ohio statute involved in Williams and Bradley includes the term "flee," which Vermont's statute does not. See Ohio Rev. Code Ann. § 2921.331(B) (2012) ("No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to the bring the person's motor vehicle to a stop." (emphasis added)). In this way, the Ohio statute is like § 11-911 of the Uniform Vehicle Code adopted by the National Committee on Uniform Traffic Laws and Ordinances. See Uniform Vehicle Code, § 11-911, at 160 (2000), https://iamtraffic.org/wp-content/uploads/2013/01/UVC2000.pdf [https://perma.cc/Y2Q2-VL9Z] ("Any driver of a motor vehicle who willfully fails or refuses to bring his or her vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle when given a visual or audible signal to bring the vehicle to a stop, shall be guilty . . . ."). It is not clear in either case whether the existence of "flee" in addition to "elude" influenced the

19

does not change the fact that, after the vehicles began moving, the defendants were signaled to stop and did not.

¶ 47.    Even construing, as we must in this posture, Penniman's utterance to "hang tight" as a "signal" under the statute, it is nonetheless not a signal to stop because defendant was not moving when Penniman said it.  See Berard, 2019 VT 65, ¶ 7 ("We consider whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." (quotation omitted)).  To the extent the Ohio Court of Appeals has interpreted Ohio's statute as prohibiting persons from merely starting their motor vehicles if commanded not to, we decline to follow that reasoning.  Our statute plainly requires a vehicle to be in motion before a qualifying signal from an enforcement officer can trigger it.

¶ 48.    Accordingly, defendant's conviction for eluding a police officer is vacated.

Defendant's DUI conviction is affirmed.  The eluding conviction is vacated.

FOR THE COURT:

_____

Associate Justice

---

Ohio Court of Appeals' analysis.  However, there is no question that "to elude or flee a police officer" is more expansive than "fail[ing] to bring [a] . . . vehicle to a stop."

20